**STATE et al. v. LONE STAR GAS CO.**

No. 8238.

Court of Civil Appeals of Texas. Austin.

April 12, 1939.

Rehearing Denied June 7, 1939.

Memorandum on Rehearing June 14, 1939.

James V. Allred, Atty. Gen., and Wm. C. Fitzhugh, Elbert Hooper, and A. R. Stout, Asst. Attys. Gen., for appellants State of Texas and Railroad Commission at the time the case was first submitted and argued.

Wm. McCraw, Atty. Gen., Alfred M. Scott and Scott Gaines, Asst. Attys. Gen., A. R. Stout (former Asst. Atty. Gen.), of Houston, F. L. Kuykendall, of Austin, and Edw. H. Lange, of Washington, D. C., for appellants while the case was in this court following Allred's administration.

Gerald C. Mann, Atty. Gen., and Hugh Q. Buck, Asst. Atty. Gen., for appellants at this time (they being successors of Wm. McCraw administration).

Ben H. Powell, Judge, of Austin, Marshall Newcomb, of Dallas, Thompson & Barwise, and Ogden K. Shannon Jr., all of Fort Worth, Roy C. Coffee, of Dallas, and Black, Graves & Stayton and Chas. L. Black, all of Austin, for appellee.

BLAIR, Justice.

In the instant case this Court sustained the validity of an order of the Railroad Commission prescribing a 32-cent per thousand cubic feet city gate rate for domestic gas delivered by Lone Star Gas Company to its several allied distributing

companies at the city gates of some 270 cities and towns in Texas, reversing the judgment of the District Court which declared the rate order to be invalid. See State of Texas et al. v. Lone Star Gas Company, Tex.Civ.App., 86 S.W.2d 484, 506. The Supreme Court of the United States reversed the judgment of this Court upon one ground (Lone Star Gas Company v. State of Texas et al., 304 U.S. 224, 58 S. Ct. 883, 891, 82 L.Ed. 1304), as follows:

"The Court of Civil Appeals reversed the judgment upon a distinct ground. That was that appellant had not sustained its burden of proof because it had failed to make 'a proper segregation of interstate and intrastate properties and business.' Thus, the necessity for that segregation was made the criterion. That is clearly shown both from the Court's main opinion and its opinion upon rehearing from which we have quoted. * * *

"We think that this ruling as to the necessity of segregation, and that the sufficiency of appellant's evidence should be determined by that criterion, was erroneous. This was not a case where the segregation of properties and business was essential in order to confine the exercise of state power to its own proper province. * * * The effort at segregation came after voluminous testimony had been taken which fully presented appellant's case with respect to the value of its property and the result of its operations as an integrated system and the bearing of this evidence upon the contested rate. This proof could not be ignored because of a futile attempt, in response to the State's pressure, to find an alternative ground to support the attack upon the Commission's order."

The cause was remanded to this Court "for further proceedings not inconsistent with the opinion of the Supreme Court." After receipt by this Court of the mandate of the Supreme Court, there arose a controversy as to what "further proceedings" should be had in the case and what judgment should be rendered thereon "not inconsistent with the opinion of the Supreme Court."

The Commission contends that since the Supreme Court reversed this Court's judgment solely upon its "untenable" ruling as to the necessity of the Gas Company's making a proper segregation of its interstate and intrastate property and business, and remanded the cause "for further proceedings not inconsistent with the opinion of the Supreme Court," this Court is required to review the "over-all" or unsegregated basis and evidence, which means the evidence relating to the Gas Company's entire integrated operating system in both Texas and Oklahoma as considered by the Commission in prescribing the rate order, and render whatever judgment is proper; and either to reverse the judgment of the District Court and render judgment sustaining the rate order as this Court did before; or to reverse the judgment of the District Court on account of the several errors of practice complained of and remand the cause for another trial on the merits, according as such over-all evidence and law and justice may require; and that either course would be entirely consistent with the opinion of the Supreme Court.

The Gas Company contends that in the "further proceedings" carrying out the mandate of the Supreme Court, this Court can not review, weigh, nor consider the so-called over-all evidence and make findings thereon, and then render any judgment such findings may require, and especially the same judgment that has already been reviewed and reversed by the Supreme Court; that the Supreme Court "reversed the judgment of this Court, not because this Court failed to make findings on the over-all evidence, but because this Court set aside the findings made by the 'trier of facts' in the District Court by applying to the over-all evidence sustaining such findings, an improper test or standard to determine its sufficiency"; and that the only judgment this Court may now render is to affirm the judgment of the District Court.

The contention now made by the Gas Company that this Court held the over-all evidence insufficient to sustain the judgment of the District Court is directly opposed to the position taken by it before the Supreme Court. There the Gas Company contended that this Court had not given any consideration, weight, nor effect whatever to the over-all evidence, but had totally disregarded same, and had based its judgment solely upon its ruling as to the necessity of the Gas Company's making a proper segregation of its interstate and intrastate property and business. So well did the Gas Company argue its point that the Supreme Court adopted that view and expressly reversed the judgment of this Court upon that sole ground.

■ Whether this Court considered the over-all evidence sufficient to sustain the

rate order as a matter of law, or considered the Gas Company's over-all evidence not sufficiently "clear and satisfactory" to sustain the District Court's judgment declaring the rate order invalid, is not material, in view of the decision of the Supreme Court that this Court did not consider the over-all evidence. That is, if this Court did so hold, such holding is now immaterial, because the Gas Company insisted and the Supreme Court held that this Court did not give any consideration, weight, nor effect whatever to the over-all evidence, but had based its judgment solely upon the "untenable" ruling as to necessity of the Gas Company's making a segregation of its interstate and intrastate property and business; and upon "an alternative ground", and "by the application of an untenable test or standard of proof," relating only to "an alternative ground to support the attack upon the Commission's order." In view of these findings and conclusions, this Court is necessarily left free, and the Supreme Court so intended, to review the entire evidence bearing upon the over-all or unsegregated property and business of the Gas Company; and upon such review either to reverse the judgment of the District Court and render judgment sustaining the validity of the rate order as this Court did before; or to reverse the judgment of the District Court and remand the cause for another trial on account of the several errors of practice which were not discussed before; or to affirm the judgment of the District Court, according as the over-all evidence and law and justice may require.

The Supreme Court also held that the Commission based its rate order and the District Court its judgment upon the evidence relating to the over-all or unsegregated basis; and that the "first and primary ground" to be determined was whether the rate was unreasonable, unjust, and confiscatory because not supported by the over-all evidence; but that this Court decided the case solely upon the alternative and improper segregated basis. The Supreme Court did not itself determine such first and primary ground; and if this Court did not, then no reason exists why it should not now do so.

The Supreme Court further held that the "first and primary ground remained and the determination of the court of first instance as the trier of facts that the Commission's rate was confiscatory could not properly be set aside by the application of an untenable standard of proof [necessity of segregation] and in disregard of the evidence which had been * * * properly submitted to the jury." The Supreme Court approved the form of a special issue submitting the question of whether the rate was "unreasonable and unjust" as substantially submitting the issue of "whether the rate was confiscatory"; and then applied the rule applicable to ordinary law suits as between individuals, to the effect that this Court could not set aside a jury finding upon conflicting evidence, and citing the cases of Post v. State, 106 Tex. 500, 171 S.W. 707, and United Gas Pub. Service Co. v. Texas, 303 U.S. 123, 58 S.Ct. 483, 82 L.Ed. 702. However, the Supreme Court specifically held that "the state is entitled to determine the procedure of its courts, so long as it provides the requisite due process"; and further held, "that a state may modify trial by jury or abolish it altogether." [58 S.Ct. 492.] Our courts have uniformly held that the scope of the judicial review of a rate order of the Railroad Commission is to determine whether it is supported by "substantial" evidence; and have required the one attacking it to show by "clear and satisfactory" evidence that it is not supported by substantial evidence; and that whether there is any "substantial" or "clear and satisfactory" evidence presents a question of law to be determined by the "judicial mind" as in any civil case, and not by a jury of laymen. In view of the fact that such has been the consistent and uniform procedure adopted by the appellate courts of this State for almost a half century, we can not follow the contention of the Gas Company that the Supreme Court intended that this Court should affirm the judgment of the District Court upon the jury's general finding herein that the rate was "unreasonable and unjust."

Briefly, we construe the opinion of the Supreme Court as holding that in this statutory action to review and enforce the order of the Commission prescribing the 32-cent rate for gas supplied by the Gas Company to its allied distributing companies at the city gates of Texas cities and towns, which rate order was made upon consideration by the Commission of the Gas Company's properties in both Texas and Oklahoma as an integrated system, the Gas Company was entitled to have the sufficiency of its evidence judged by the criterion used by the Commission; and that the trial court's judgment based upon the

jury's finding upon the same criterion that the rate was confiscatory could not be set aside by this Court upon the "untenable" and "alternative" ground and ruling as to the necessity of the Gas Company's making a proper segregation of its interstate and intrastate properties and operations. That the Supreme Court did not itself determine from the over-all evidence the legal question of whether the Gas Company had shown by "clear and satisfactory evidence" that the rate order was not based upon substantial evidence, or that the rate prescribed would not afford the Gas Company a reasonable return on the fair value of its Texas and Oklahoma properties used in the Texas public service; and that having held that this Court did not consider, weigh, nor give any effect whatever to the over-all evidence, then this Court is now entitled and required to do so, and to determine the case according as such review of the over-all evidence and law and justice may require. Any other conclusion would deprive this Court of its final jurisdiction to determine all questions of fact raised on the appeal as it is required to do under the Texas Constitution, Vernon's Ann.St. (Art. 5, § 6), which defines the jurisdiction of the Courts of Civil Appeals, and provides, "that the decision of said courts shall be conclusive on all questions of fact brought before them on appeal or error."

Having on the former hearing determined that no jury question arose under the facts when viewed in the light of the established scope of a judicial review of the legislative rate order of the Commission, the Court did not discuss nor determine the procedural or practice errors asserted, which would have required that the ·cause be reversed and remanded. Not having jurisdiction of these questions, the Supreme Court did not determine them; and of course has not deprived this Court of its jurisdiction to now do so. And while this Court has again reached the conclusion that when viewed in the light of the over-all or unsegregated basis and evidence the legislative rate order is valid as a matter of law as against the attacks made upon it,' it is thought proper to first point out the procedural or practice errors. This is not done for the purpose of now reversing and remanding the cause, but in order that the Supreme Court of Texas or the Supreme Court of the United States might have the views of this Court on the entire case, should either be again called upon to review the decision of this Court; and in order that either may accordingly direct final disposition of this long drawn out litigation.

■■■■ The trial court erroneously excluded the record of the proceedings before the Commission upon which it based its rate order. Such record consists of a transcript of 11,232 pages containing all of the testimony taken before the Commission relating to the over-all or unsegregated basis of operation in both Texas and Oklahoma, and to every element of a proper rate structure—rate base, expenses, revenues, depreciations, and rate of return. Since the rate order was attacked by both pleadings and evidence as being unreasonable, unjust, and confiscatory because not supported by substantial evidence, the most plausible and proper way to refute such an attack was to introduce the record of the evidence given on the hearing before the Commission. Shupee v. Railroad Com., 123 Tex. 521, 73 S.W.2d 505, affirmed Tex. Civ.App., 57 S.W.2d 295; Railroad Com. v. Galveston C. of C., 105 Tex. 101, 145 S.W. 573; Railroad Com. v. Rau, Tex.Civ.App., 45 S.W.2d 413; Railroad Com. v. Lamb, Tex.Civ.App., 81 S.W.2d 161; Humble Oil & Refining Co. v. R. R. Com., Tex.Civ. App., 99 S.W.2d 401; Railroad Com. v. Uvalde Construction Co., Tex.Civ.App., 49 S.W.2d 1113, writ refused; Humble Oil & Refining Co. v. R.R. Com., 94 S.W. 2d 1197, writ refused; Humble Oil & Refining Co. v. R. R. Com., 112 S.W.2d 222, 226, writ dismissed. This rule does not preclude the introduction of additional evidence pertinent to the issue in the court proceeding in the exercise of the independent jurisdiction of the court in the premises. Such is the procedure sanctioned in the recent case of United Gas Public Service Co. v. Texas, 303 U.S. 123, 58 S.Ct. 483, 82 L.Ed. 702, wherein the entire record of the proceedings before the Commission was introduced in the court proceeding and was considered along with additional evidence in sustaining the rate order of the Commission as against the attack that it was unreasonable, unjust, and confiscatory·because not supported by sufficient or substantial evidence. See this Court's opinion in United Gas Public Service v. State, 89 S.W.2d 1094. See also the case of St. Joseph Stockyards Co. v. United States, 298 U.S. 38, 56 S.Ct. 720, 726, 80 L.Ed. 1033, wherein the only evidence before the courts was the record of the evidence presented at the legislative agency's

hearing and its findings; and in sustaining the rate order the Supreme Court say: "But this judicial duty to exercise an independent judgment does not require or justify disregard of the weight which may properly attach to findings upon hearing and evidence. On the contrary, the judicial duty is performed in the light of the proceedings already had and may be greatly facilitated by the assembly and analysis of the facts in the course of the legislative determination. Judicial judgment may be none the less appropriately independent because informed and aided by the sifting procedure of an expert legislative agency."

And in the case of United States v. Idaho, 298 U.S. 105, 56 S.Ct. 690, 691, 80 L.Ed. 1070, wherein "the record made before the Commission was introduced in evidence; also some testimony 'which merely amplified evidence already in the record'", the court held that "although it would have been better practice to have introduced all relevant evidence before the Commission, as appellee's counsel concede, the court did not err in admitting the additional testimony" which related to the mixed question of law and fact as to whether the trackage was a spur, and as to which Congress had not left final determination to the legislative or administrative agency.

■ The Commission made its rate order and then carefully prepared findings of fact, which ably and expertly assembled, analyzed, and sifted all of the testimony before the Commission, referring to the pages of such transcript of the testimony from which the findings were taken. The Gas Company itself introduced these findings by the Commission, and then attempted to tear them down by introducing the elaborate calculations, estimates, and comparisons of its experts relating to the rate structure from the over-all or unsegregated basis; but which were the same, or in substance, effect, and result the same as were used and made by these experts on the hearing before the Commission. But when the record of the evidence before the Commission, and from which its findings were made and upon which the rate order was based, was offered in rebuttal after the Gas Company had rested, the Gas Company objected, and the record of the testimony before the Commission was excluded. Thus the Gas Company was allowed to offer evidence attempting to tear down the findings of the Commission; and the Commission was denied the right to refute the attack by the very evidence upon which it based its rate order; and under the rules above stated this was clearly error. And if any jury question were presented, then the jury was deprived of this complete transcript of the evidence adduced before the Commission bearing upon the only issue submitted to them. The record of the evidence before the Commission has been brought to this Court by a proper bill of exception.

■ If any jury question were presented, then the trial court erred in its definition of the term "used and useful" in its charge to the jury, which reads: "By the term 'used and useful' is meant the property of the defendant actually being used by the defendant in the production, transportation, sale, and delivery of natural gas to its customers; and also such property as has been acquired by the defendant in good faith and held for use in the reasonably near future in order to enable it to supply and furnish adequate and uninterrupted gas service."

■ Under this definition of the term "used and useful" the jury, if not absolutely required to do so, were necessarily permitted to take into consideration in arriving at its rate base the book costs of gas leaseholds in the Petrolia Field, aggregating $687,781.15, for which the Commission refused to allow anything, except salvage value, because as pointed out in its findings of fact introduced by the Gas Company, the expenses of its operation substantially exceeded the value of the gas recovered when measured by the fact that the Gas Company could purchase all the gas it could use in the open market at a much smaller outlay. The question of what property was used and useful was primarily for the Commission to determine, and since it determined the question upon amply sufficient and very substantial evidence, as shown by its findings of fact in evidence, the issue should not have been submitted to the jury.

The same is true of the Gas Company's claim to the book costs of its undeveloped gas leaseholds, aggregating $893,291.18. The Gas Company's developed and productive leaseholds were shown to be more than adequate for its gas needs for more than 40 years to come. An adequate open market supply of cheap gas also existed. Los Angeles Gas Co. v. R. R. Com., 289 U.S. 287, 53 S.Ct. 637, 77 L.Ed. 1180; Logan

Gas Co. v. Pub. Utilities Commission, 121 Ohio St. 507, 169 N.E. 575.

The charge also authorized and necessarily directed the jury that in determining its own rate base to take into consideration the highly speculative valuation of $7,436,-650 placed by the Gas Company upon its developed and productive leaseholds; and in any event the charge effectively closed the door to the Commission's more simple and direct method of handling production costs and properties by allowing the full value of the gas at the wellhead at the current market price on an annual or current basis, which was shown to be a proper method of determining such matters.

■ The trial court also erred in permitting the Gas Company's witness, ·Ed. C. Connor, to testify in effect that he knew what percentage rate of return the Railroad Commission had always fixed for gas utilities; and that it had never fixed a rate of less than 7%. This evidence was primarily intended to bear upon the question of the reasonableness or justness of the rate as to whether 6% would afford a reasonable return. The witness made no comparable basis between the rate fixed in this case and those which had been fixed for other similar gas utilities. So far as the record shows, this was the first pipe line gate rate case the Commission of Texas ever had up to that time. And while the record shows that the Commission has in some instances allowed a slightly higher rate of return to distributing companies, such difference in allowance has reasonable factual basis. In this situation, the testimony of the expert that the Commission had never allowed less than 7%— no factual basis showing any other gas utility of a similar nature had ever been allowed 7% on a comparable basis with this Gas Company—was clearly objectionable.

■ The trial court erred in refusing to exclude upon objection of the Commission Volumes 7 and 8 of Exhibit 28, presented by the Gas Company's expert Connor, because, in addition to estimates, calculations, and comparisons which may have been proper, they contained the written arguments and self-serving and hearsay declarations of the expert in support thereof. Such written arguments, hypotheses, and authorities cited by the expert witness in attempting to sustain his elaborate cal·culations were improper, and were no more admissible than if a lawyer in the case had written his ·argument and submitted it to the jury. Dallas Ry. & Terminal Co. v. Curtis, Tex.Civ.App., 53 S.W.2d 85; 22 ·C.J. 199. This same holding is made with respect to Exhibit No. 42 by the same witness Connor; and to Exhibits Nos. 4 to 14 both inclusive, by witness Hulcy.

■ Exhibit No. 32 by Steinberger should have been excluded because it included in the rate base the undeveloped gas leaseholds valued at $893,291.18, which as above held was not used nor useful in the properties dedicated to the public service.

■ Certain improper and prejudicial argument to the jury by counsel for the Gas Company with respect to who brought this suit, or was responsible for it; and that a witness for the Commission and the two assistant attorneys general who represented the Commission were responsible for the suit and for the jury's being "cooped up" during the long, dry, hot summer months, when they wanted to be away, should not have been permitted. We pretermit further discussion, because if another jury trial should be had such argument will no doubt not be made nor permitted to be made.

■ But having again reached the conclusion that the over-all evidence substantially sustains the rate order against the attack made upon it, we pass to a consideration of the question, which ·is the only question left in the case, all other questions of interstate commerce and constitutional law having been heretofore determined by both this Court and the Supreme Court. See 86 S.W.2d 506, and 304 U.S. 224, 58 S.Ct. 883, 82 L.Ed. 1304.

■ The specific attack made upon the rate order is that it is unreasonable, unjust, and confiscatory because too low to afford the Gas Company a reasonable return on the fair value of its properties, situated in both Texas and Oklahoma, and used in the Texas public service. In adjudicating this question, the scope of the judicial review is to determine whether the rate order is based upon "substantial evidence," the burden being placed by statute (Art. 6059) on the Gas Company to show by "clear and. satisfactory evidence" that the rate order is not based upon substantial evidence, or that the rate prescribed will not afford the Gas Company a reasonable return on the fair value of its properties used in the Texas public serv-

ice; and the question presented is one of law to be determined by the "judicial mind," and not by a jury. In determining this scope of judicial review, our courts have been governed by two fundamental principles, which will be here pointed out.

■ First. In the judicial review of a legislative rate order, or of any discretionary administrative order, rule, regulation, or conclusion of the Commission, the courts have regarded the Commission as occupying the position of the trial court or jury with respect to findings of fact, and have accorded to such findings the same degree of verity as is accorded to the findings of a trial judge or jury in any civil case; and in consequence the courts have established the rule that the scope of the judicial review is to determine whether the rate order, rule, regulation, or conclusion of the Commission is based upon substantial evidence. In the case of State v. St. Louis Ry. Co., Tex.Civ.App., 165 S.W. 491, 495, the court held: "The findings of fact found by the trial court as to reasonableness and public necessity were the reverse of those found by us. Ordinarily we would feel bound by the findings of fact by the trial court, unless it clearly appeared that such findings were wrong. In this case, however, we regard the Railroad Commission as occupying the place ordinarily occupied by a trial court. The duty devolved upon it primarily to ascertain the facts. The suit before the district court upon appellees' answer was in the nature of an appeal from the findings of the commission. The statute provides that in such suits the burden rests upon the party complaining of the orders of the commission to show, 'by clear and satisfactory evidence,' that the orders complained of are unjust and unreasonable. Article 6658, R.S.1911; [Railroad] Commission v. Chamber of Commerce, 105 Tex. 101, 145 S.W. [573] 580; [Gulf, C. & S. F.] Ry. Co. v. Commission, 102 Tex. [338] 353, 113 S.W. 741, 116 S.W. 795. The findings of fact by the commission upon which its orders are based are to be taken as prima facie correct. Revisory power is lodged in the court, but 'it was not intended that we (nor the trial court) should substitute our judgment for that of the commission. * * *' "

In the case of Producers' Ref. Co. v. Missouri, K. & T. R. Co., Tex.Com.App., 13 S.W.2d 679, it is held: "The orders of the Railroad Commission are to be likened to the judgments of courts. While the commission is not a part of our judiciary system, nevertheless its duties are quasi judicial, and its functions, in many respects, are those of a court. Aransas Harbor, etc. Co. v. Taber (Tex.Com.App.), 235 S.W. 841; Railroad Commission of Texas v. San Antonio Compress Co. (Tex. Civ.App.) 264 S.W. 214, writ refused; Missouri, K. & T. Ry. Co. v. State (Tex. Civ.App.) 275 S.W. 673. Whether it be treated as a tribunal of general or limited jurisdiction, the sanctity of its orders is the same. * * * It is the one tribunal with power to make rates affecting common carriers. When it establishes a rate, it necessarily finds that such rate is neither unreasonable nor discriminatory. The order, therefore, is not in violation of, but in exact keeping with, the requirements of the Constitution and statute."

And in the recent case of Humble Oil & Refining Co. v. Railroad Commission, Tex. Civ.App., 112 S.W.2d 222, 226, writ dismissed, the court held: "It is a familiar rule of law that a jury's finding of fact is not reviewable in a direct proceeding on appeal, unless it is unsupported by evidence. The same is true of orders and findings of fact by a regulatory board or commission. The decision of such a board has at least as high standing in regard to finality as a verdict or finding of a jury. Texas Juris, Vol. 3, p. 1088 et seq. Such has been the uniform holding of our courts with reference to valuations found by tax and equalization boards; to orders, rules, and regulations made by the state superintendent of public schools; with regard to the granting or refusing of a permit of convenience and necessity to operate buses and trucks; and with regard to the rates of railroad companies and public utility companies. Duck v. Peeler, 74 Tex. 268, 11 S.W. 1111; [Shupee v. Railroad Com., 123 Tex. 521; 73 S.W.2d 505], affirmed (Tex.Civ.App.) 57 S.W.2d 295; Texas & Pacific Motor Transp. Co. v. Railroad Com., 124 Tex. 126, 73 S.W.2d 509 [affirmed (Tex.Civ.App.) [Railroad Com. of Texas v. Winkle], 57 S.W.2d 287]; State v. Lone Star Gas Co., Tex.Civ. App., 86 S.W.2d 484; Railroad Com. v. Lamb, Tex.Civ.App., 81 S.W.2d 161; Producers' Refining Co. v. Missouri, K. & T. Ry. Co., Tex.Com.App., 13 S.W.2d 679."

■ Where the rate order is attacked upon the ground that it is unreasonable and unjust and confiscatory because

not based upon substantial evidence, as in the instant case, and the Commission is regarded as occupying the position of the trial court or jury with respect to findings of fact upon which the rate order is based, then the rule on the statutory appeal to the court is that the trial judge shall admit and review the record of the facts before the Commission, or its findings of fact, and such additional facts as might aid in determining whether the rate order is based upon substantial evidence, and the trial judge shall determine this purely legal question as in any civil case and in the light of the burden and quantum of proof placed by the statute upon the party complaining to show by "clear and satisfactory evidence" that the rate order is not based upon substantial evidence, or that the rate prescribed will not afford a reasonable return on the fair value of the property used in the public service. The rule is one of easy application and meets every test of due process and equal protection of laws. Under it the court on appeal simply admits and reviews the record of the evidence before the Commission, or its findings of fact, and is left free, if it thinks proper in the exercise of its independent judicial judgment, to admit additional evidence pertinent to the issue of whether the rate order is based upon substantial evidence, although recent descisions indicate that the power of admitting additional evidence should be used sparingly. St. Joseph Stockyard Co. v. U. S., 298 U.S. 38, 56 S.Ct. 720, 80 L.Ed. 1033; United States v. Idaho, 298 U.S. 105, 56 S.Ct. 690, 80 L.Ed. 1070; Baltimore & Ohio R. R. v. United States, 298 U.S. 349, 56 S.Ct. 797, 80 L.Ed. 1209. Compare Acker v. United States, 296 U.S. 426, 56 S.Ct. 824, 80 L.Ed. 1257. The rule stated is substantially, if not precisely, the rule that has been actually applied by our courts in reviewing legislative and administrative action of the commission. We find no case reviewing a legislative rate order that was submitted to the jury in any form, and no case reviewing the administrative action of the Commission where final determination was predicated upon a jury finding. These two gas rate cases were the first to have ever been submitted to a jury, and each was submitted on a general charge and a special issue, which method has been uniformly condemned in our practice. Cannon Ball Freight Lines v. Grasso, 125 Tex. 154, 81 S.W.2d 482; Art. 2190, Vernon's Civil Statutes and Supp., and cases cited in footnote 20. And in sustaining the

validity of the gas rate prescribed in said cases this Court specifically pointed out that under the scope of judicial review of rate making by the Commission adopted in this State, the jury's finding was not necessary nor material, because the question presented was one of law to be determined by the "judicial mind" as in any civil case. That is, in any civil case where the findings of fact by the trial court or jury, and upon which the judgment is based, are attacked as not being supported by "any evidence," or by "any substantial evidence," or, if the burden and quantum of proof require, by "clear and satisfactory evidence," the question presented to the appellate court is one of law for the court to determine; and the power of all appellate courts to reverse the findings of fact of the trial judge or jury on these grounds is universally recognized. And the Constitution, the statutes, and the decisions of this State fully establish the power and authority of the Courts of Civil Appeals to review the evidence and to reverse the findings of fact of the trial judge or jury upon the grounds that same are not based upon "any or sufficient evidence," or upon "substantial evidence," or upon "clear and satisfactory evidence," as the burden and quantum of proof may require; and to then render such judgment as the trial court should have rendered under the evidence. Art. 5, § 6, Constitution Vernon's Ann.St.; Art. 1856, R.S.1925; Owens v. Tedford, 114 Tex. 390, 269 S.W. 418; Electric Express Co. v. Ablon, 110 Tex. 235, 218 S.W. 1030; Choate v. San Antonio Ry. Co., 91 Tex. 406, 44 S.W. 69; Holman v. Holman, Tex. Com.App., 288 S.W. 413; Gray v. Kaliski, Tex.Com.App., 45 S.W.2d 157; Westerly Supply Corp. v. State, Tex.Civ.App., 89 S. W.2d 244. And see particularly the following cases which hold that whether there is clear and satisfactory evidence is a question of law to be determined by the courts, and not by a jury: Railroad Com. v. Galveston Chamber of Commerce, 105 Tex. 101, 145 S.W. 573; Shupee v. R. R. Com., 123 Tex. 521, 73 S.W.2d 505, affirming, Tex.Civ.App., 57 S.W.2d 295; Reinhardt v. Nehring, Tex.Com.App., 291 S.W. 873; Carl v. Settegast, Tex.Com.App., 237 S.W. 238; Briscoe v. Bright's Adm'r, Tex.Com. App., 231 S.W. 1082, wherein it is held that in treating the question of the sufficiency of the evidence to clearly and satisfactorily establish the findings upon which the judgment is based as one of law, only, the evidence must be viewed most strongly in sup-

port of the judgment of the trial court. And since the Commission is regarded as occupying the position of the trial court with respect to its findings of fact upon which the rate order is based, then on appeal to the courts the evidence must be viewed most strongly in favor of the rate order.

The rule of regarding the Commission as occupying the position of the trial court or jury with respect to the findings of fact upon which the rate order is based is not only one of easy application and reasonable, but, as applied to the instant case, any other rule would lead to utmost absurdity with regard to the hearing before the Commission and the enormous expense necessary to such hearing. A statement from the Commission's original brief herein suffices to illustrate the point: "After due notice, a hearing extending over a period of eight months was held. Over 11,000 pages of testimony were taken. Countless exhibits were introduced. The Company furnished the Commission with a lengthy printed brief in support of its argument. Out of the mass of data, documents, and facts, experts passed upon what trained witnesses, experts and engineers had testified to. From this vast amount of technical facts, a result was reached by men of experience. For this hearing alone the Company paid out an amount aggregating $150,000 from the revenues derived from the ratepayers. The cost to the State was in excess of $75,000. Is this work to go for naught simply because of the power to file a contest?" Manifestly such was not the intention of the legislature because it declared that on the appeal to the court the rate order shall be regarded as presumptively valid, and that the one attacking it must show by "clear and satisfactory evidence" that it is invalid or unreasonable. Art. 6059, which does not, as do some statutes, provide that the trial on the appeal to the court shall be de novo; but merely provides that "said action * * * shall be tried and determined as other civil causes." This difference is not regarded as being of controlling materiality, because in construing this and similar statutes authorizing a court review of legislative and administrative action of the Commission, the courts have uniformly held that they are intended and calculated to guard the Commission against any undue interference by the courts, and are intended to attribute a high degree of verity to the findings and conclusions of the Commission. Railroad Com. v. Galveston C. of C., 105 Tex. 101, 145 S. W. 573; Shupee v. R. R. Com., 123 Tex. 521, 73 S.W.2d 505, affirming, Tex.Civ. App., 57 S.W.2d 295. If such findings and conclusions of the Commission and the testimony upon which they are based are excluded on the court hearing, how could a high degree of verity be given to them; and the legislature having so provided, it necessarily intended that such evidence, findings of fact, and conclusions of the Commission should be considered on the court review, because it directed the court to attach great verity to them.

Had the trial court properly applied the aforementioned rule in the instant case, it would have greatly reduced the amount of testimony taken in the trial court, and would have conserved much time and expense necessary to the trial, because testimony before the Commission and the testimony before the trial court was in the main and ultimate results the same. The testimony before the Commission consisted principally of numerous and voluminous calculations and estimates of six experts, two for the Commission and four for the Gas Company, and their explanations of the calculations and estimates. The Commission carefully prepared its findings of fact based upon the mass of evidence before it, interpreting the calculations and estimates of the experts; and by comparisons of their factual basis showed that the ones prepared by the Commission's experts were better supported by the facts. These findings of fact by the Commission were introduced in the trial court by the Gas Company, and then 11,000 pages of testimony was taken, explaining the numerous calculations, estimates, and comparisons, aggregating more than 20,000 pages, which were also introduced in evidence and which were prepared by the same experts who appeared before the Commission; and which calculations and estimates in effect and ultimate results were the same and were based substantially upon the same factual basis as were those presented to the Commission. One illustration will suffice here. Before the Commission, the Gas Company estimated reproduction cost new value of its over-all property used in the Texas public service (Exhibit No. 6) at $73,927,635.43, and its depreciated estimated value at $70,156,465.73. In the trial court the same witnesses estimated reproduction cost new value of said property (Exhibit No. 28) at $73,983,405.37, and its depreciated value (Exhibit No. 37) at $69,738,021.16. The

1176

book cost valuations before the Commission and the trial court were practically the same, or in substance, effect, and result the same. If the trial judge had admitted the testimony before the Commission, its findings of fact, and such additional evidence as was necessary to explain or correct them, much of the testimony and calculations and estimates before the trial court could have been excluded. Such procedure would not have deprived the parties of any evidence material to their case; and the "independent judicial duty" would have been "performed in the light of the proceedings already had" and would have been "greatly facilitated by the assembly and analysis of the facts in the course of the legislative determination," because "judicial judgment may be none the less appropriately independent because informed and aided by the sifting procedure of an expert legislative agency." St. Joseph Stockyard Company case, supra. The record of more than 40,000 pages, the aggregate of the testimony explaining the numerous elaborate calculations and estimates, together with such calculations and estimates, cannot be supported by any good reason or right; and frankness compels the admission that this court has not read every word and line of the calculations and estimates, and it would be too great a strain upon credulity to even assume that the jury in its less than three days deliberation on the case read every word and line of the more than 20,000 pages of estimates and calculations submitted to them.

▉▉▉▉ Second. Rate making is essentially a legislative function, and public utility rates fixed by the commission have the same force and effect of statutes, and are subject to court review to the extent only as statutes of the same import are so subject, with the additional statutory authority of the court to determine whether the rate is unjust and unreasonable, and the inherent power of the court to determine the constitutional question of confiscation. Missouri, K. & T. Ry. Co. v. R. R. Com., Tex.Civ.App., 3 S.W.2d 489, affirmed, Producers' Ref. Co. v. Missouri, K. & T. R. Co., Tex.Com.App., 13 S.W.2d 679, 680. Rates fixed by the Commission are presumed to be valid, reasonable, and just until declared otherwise by a court of competent jurisdiction. Railroad Com. v. Uvalde Construction Co., Tex.Civ. App., 49 S.W.2d 1113. In order to overcome this presumption in favor of the validity of the rate on the constitutional ground of confiscation, the burden of proof rests heavily upon the complaining party. Dayton Power & Light Co. v. Public Utilities Com., 292 U.S. 290, 54 S.Ct. 647, 78 L.Ed. 1267. In order to set aside the rate as being unjust and unreasonable, the statute (Art. 6059) requires the complaining party to show "by clear and satisfactory evidence that" such rate is "unreasonable and unjust." The party attacking a rate as being unreasonable and unjust must allege facts which, if proved, would show the rate to be unjust and unreasonable as a matter of law, and to prove by clear and satisfactory evidence "which leaves no reasonable doubt in the judicial mind that the rate or rule is unjust and unreasonable." Railroad Com. v. Galveston Chamber of Commerce, 105 Tex. 101, 145 S.W. 573, 580; Railroad Com. v. Weld & Neville, 96 Tex. 394, 409, 73 S.W. 529. In advance of any actual tests of the practical result of the new rate, the court on appeal will not disturb the rate where it is based upon conflicting evidence as to valuations of property or as to any other item used as a basis for the calculation of the rate, because to do so would merely substitute the findings of the court or jury upon conflicting evidence for that of the Commission, and would therefore permit the court to exercise the legislative function of rate making. Newton v. Consolidated Gas Co., 258 U.S. 165, 42 S.Ct. 264, 66 L.Ed. 538, 547. Not only are rates presumptively valid because the statute makes them so; but being legislative or official determinations they are so without a statute. Railroad Com. v. Magnolia Pet. Co., 130 Tex. 484, 109 S.W. 2d 967.

▉▉▉▉ Upon consideration of the aforementioned principles governing the scope of a judicial review of legislative or administrative action of the Commission or other governmental administrative agencies, the rule has been announced so repeatedly by the Texas courts that it has become an axiomatic principle of law that the Commission is the agency of the State with respect to the legislative or administrative power and authority vested in it, and that the courts have no power or authority to disturb any conclusion made by it within its delegated power and authority, when based upon substantial evidence. If a particular determination of the Commission or other agency is based upon substantial evidence, it is manifestly neither

unreasonable, unjust, nor confiscatory. In so limiting the scope of judicial review of legislative or administrative action, the Texas courts have recognized and applied the doctrine of the separation of powers of government as provided for in both the State and the Federal Constitutions. They have also recognized that legislative or administrative action is usually placed in the hands of officials who are themselves, or who are authorized to employ persons of technical competence and specialized knowledge in their particular fields of governmental activity; and that review by non-expert judges or juries of the technical fact determination involved in large areas of modern administration, even where private interests are concerned, would be neither desirable nor possible; and have frankly recognized that from a purely functional standpoint, courts are ill equipped to exercise legislative or administrative policies, and therefore do not attempt to make legislative or administrative determination, but merely review legislative or administrative determination to require reasonableness of the determination made by the Commission or administrative body, and to prevent determination not authorized by statutory or constitutional law, and to require that the legislative or administrative determination be based upon substantial evidence. A cursory review of the legion of Texas cases reviewing such legislative or administrative determination reveals the fact that such judicial review has done its full part in reversing invalid, arbitrary, and unreasonable action of the Commission, or other administrative bodies. The instant case is a concrete illustration of the fact that it is neither possible nor desirable for the courts to extend review of legislative or administrative determination beyond requiring that it shall be based upon substantial evidence. Practically all of the evidence establishing the utility rate necessarily came from expert engineers and accountants, which required expert knowledge or experience not required of the non-expert judge or jury. The expert evidence given was then analyzed by the experts to determine the basic facts upon which final determination rested. The Commission afforded a full hearing, which extended over a period of more than seven months. The courts have now had the rate order for review approximately six years, and final adjudication is still in the future; and no court has under its established rules of procedure unduly delayed action in the case.

In the meantime the courts have enjoined the Commission from the enforcement of its rate order. And it is in the light of this established scope of judicial review that this Court has again concluded that the rate order is valid because based upon substantial evidence, that is, the over-all or unsegregated basis and evidence; and we pass to a consideration of it.

Our findings of fact and conclusion that the rate order is based upon substantial evidence and that the Gas Company did not show by clear and satisfactory evidence that it was not based upon substantial evidence, are predicated on the findings of fact of the Commission introduced in the trial court by the Gas Company; the Gas Company's testimony, estimates, and calculations adduced in the trial court; and the testimony, estimates, and calculations adduced by the Commission in the trial court. We do not predicate our findings and conclusion on the record of the testimony before the Commission, which was erroneously excluded by the trial court; although, with the exception of a few corrections, adjustments, and additional calculations, it is the same, or in substance, effect, and ultimate calculations and results the same as the testimony, estimates, and calculations given particularly by the Gas Company's experts in the trial court. We have also considered the estimates and calculations shown by witness Connor's Volumes 7 and 8 of Exhibits 28 and 42, and witness Hulcy's Exhibits Nos. 4 to 14, both inclusive, eliminating therefrom the written arguments, hypotheses, and authorities cited to sustain them, which we held improper to submit to a jury, if a jury question were involved.

The voluminous statement of facts and the multitude of estimates and calculations presented in the record render impossible any attempt to discuss them in detail. We must, therefore, be content with a statement of the controlling ultimate facts, and which, from our consideration of the entire record, show the principal differences between the parties, and show the rate order to be based upon substantial evidence.

*Hearing before Commission.* The Commission's findings of fact represent a splendid piece of work fairly and expertly done. No complaint is made and none could be made that the Gas Company was not afforded a full and fair hearing before the Commission. Thousands of pages of tes-

timony were taken and voluminous estimates and calculations made by the Commission's and the Gas Company's experts were introduced before the Commission. These estimates and calculations were then submitted to and time given the experts of both parties for examination, analysis, and criticism. And then with the aid of its experts, the Commission by its findings of fact assembled, analyzed, and sifted the testimony, estimates, and calculations before it. The facts thus found by the Commission are based largely upon the actual history and experience of the Gas Company's business, the book costs, and the reproduction new costs of its entire properties, situated both in Texas and Oklahoma, and used in the Texas public service; rather than upon the hypothetical business and the highly speculative intangible valuations sought to be constructed and established by the Gas Company's employed experts.

The year 1931 was selected by the Commission as a basis of calculation to determine whether the rate prescribed would earn a reasonable return on the fair value of the properties used in the public service. The rate was then tested by the detailed statements of the revenues, expenses, the book costs as taken from the records of the Gas Company for the years 1927—1932, both inclusive, and also reproduction new costs for the year 1931. The Commission also had before it the same character of statements for the year ending April 30, 1933. No comparable tests were made by the Gas Company. It presented such statements for only the calendar years 1931 and 1932, and the overlapping year ending April 30, 1933. The first three years, 1927–1929, as used by the Commission, were admitted to be prosperous years, and the last three years used by the Commission were lean years, due to the general depression prevailing everywhere, and including the year 1933, which was shown to be the warmest year in the history of the Gas Company's business, although business conditions were better. Thus by shortening the period of operations, and in failing to make temperature adjustments, the Gas Company was able to show a much lower rate of return than it enjoyed for the longer six-year and overlapping year 1933 period employed by the Commission. The longer period employed by the Commission was manifestly the fairer and more reasonable test period. United Gas Public Service Co. v. Texas, 303 U. S. 123, 58 S.Ct. 483, 82 L.Ed. 702, Id., Tex.

Civ.App., 89 S.W.2d 1094. Not having furnished statements covering a reasonable period of operation, the Gas Company did not show by clear and satisfactory evidence that the rate was unreasonable, unjust, or confiscatory. It selected a two and one-third-year period, which represented the lowest earnings of its entire history, due to the business depression prevailing everywhere and to warm weather prevailing in the last year; and the evidence showed a definite up swing in business conditions for the year ending March 31, 1934, as presented in the trial court. And with respect to the right to make temperature adjustments see Los Angeles Gas & Electric Co. v. Commission, 289 U.S. 287, 53 S.Ct. 637, 77 L.Ed. 1180. These same differences as to test periods and temperature adjustments existed in the hearing in the trial court; however, each party extended statements down to March 31, 1934, in the trial court.

Table I, hereto attached, represents calculations of returns based on the Commission's findings and the 32-cent gate rate.

Table II, hereto attached, represents the estimates and calculations used by the Gas Company before the Commission. The record of the testimony before the Commission containing these estimates and calculations was excluded in the District Court, on the objection of the Gas Company, and such record is before us by bill of exception. Such estimates and calculations are used here only for the purpose of comparing same with the testimony, estimates, and calculations adduced by the Gas Company in the District Court.

*Hearing before District Court.* Although our statutes and court decisions attribute a high degree of verity to the findings of fact by the Commission in matters of legislative rate-making, the trial judge merely permitted the findings of fact of the Commission to be introduced in evidence, excluded the record or statement of facts on which they were based, and did not determine from them and the other evidence adduced the legal question of whether the rate order was based upon substantial evidence; but submitted such findings by the Commission to the jury with instructions that "you may consider same for the purpose for which same were admitted in evidence,—that is, for the purpose of assisting you (if same does assist you) in determining whether the order (rate order) * * * is unreasonable and unjust

to defendant, and for no other purpose." Thousands of pages of testimony, estimates and calculations by both parties were then adduced before the District Court. Under this instruction the jury was manifestly permitted to either consider or not consider the findings of fact by the Commission, notwithstanding the statutes and decisions attribute to them a high degree of verity, and require that they be regarded as presumptively valid unless shown by clear and satisfactory evidence to be unreasonable or invalid; and the jury was manifestly permitted, upon substantially the same evidence as was before the Commission, to substitute its own findings for those of the Commission.

Table III, hereto attached, represents the estimates and calculations used by the Commission in the District Court. They are based upon the findings of fact of the Commission, and testimony, estimates, and calculations adduced by both parties in the District Court.

Table IV, hereto attached, represents the estimates and calculations adduced by the Gas Company in the District Court.

These Tables have been prepared as a basis of calculations to determine whether or not the rate prescribed by the Commission will afford a reasonable return on the value of the Company's properties situated in both Texas and Oklahoma and used in the Texas public service. It may be here observed that the Commission based its calculations upon an undepreciated rate base while the Company, by employing the straight line method in spreading depreciation on certain large items of property, involves the use of depreciated values, although it did not consistently use depreciated values in its calculations.

The principal points of difference relate to: (1) rate base; (2) depreciation and depletion; and (3) operating expenses. The only material difference with respect to operating revenues relates to temperature adjustments and periods of calculations covered. A difference also arises with respect to what should be a reasonable rate of return.

### Rate Base.

The Commission, in its determination of a rate base, found a reproduction cost new value at December 31, 1931, of $46,-246,617.53 for all of the Company's gas properties and business in Texas and Oklahoma.

The Commission also found the average book costs of the properties inclusive of the Petrolia Field investment ranging from $29,517,879.08 in 1927 to $46,745,646.84 in 1930. The book cost at December 31, 1931, was shown by the Company to be $47,776,-749.63. The Commission found the Company's investment in the Petrolia Field (in the amount of $758,619.23) to be no longer useful, and properly excluded it from the rate base. The Commission in its findings of fact stated that "The present worth or fair value of the Petrolia Field public service property is nil; and we have not, therefore, determined a reproduction cost new for leaseholds, gas wells, and field line equipment. We have included the full salvage value of all of the equipment in the Petrolia Field as part of Working Capital. We cannot condone an attempt to include worthless properties in an appraisal for the apparent purpose of increasing the Rate Base. The inclusion of these properties was questioned in the hearing, the Company failed to show any justification for continuing to operate this field at a loss." The Company in no way refuted in the trial court these findings by the Commission. This leaves a difference between the Company's book cost of property used and useful and the Commission's reproduction cost new, of only $771,512.87. In discussing this difference, the Commission stated that, "Inasmuch as a large part of the properties were built during peak price periods (years 1928 and 1929), and inasmuch as the Rate Base is 'undepreciated', the comparison is quite reasonable." So far as actual structural costs are concerned, the Company's experts found that it would cost less to reproduce numerous items of property than the amounts claimed as "book costs".

These illustrations will suffice here: In the matter of compressor stations the Company's reproduction cost new at December 31, 1931 (January 1, 1932), was $89,000 less than their "book costs" at the same date. There appears a similar difference of $148,000 in the item "General Office Building." Other items could be cited.

The Company presented in the hearing before the Commission a reproduction cost new rate base of $73,927,635.43 as of December 31, 1931 (January 1, 1932), (see Table II), and presented during the trial in the District Court a corresponding figure (at January 1, 1933) of $73,983,405.47 (see Table IV). Since the Company's figures

as presented before the Commission and as submitted in the District Court are almost identical and the Commission's figures as found by it in its findings of fact and introduced without change in the District Court, the evidence before the Commission may be adverted to for comparison purposes and as showing that the trial court had substantially the same evidence before it as was before the Commission. The rate base found by the Commission was at December 31, 1931. The record shows that effective January 1, 1932, the Lone Star Gas Company "acquired" from the Lone Star Gas Corporation the properties (principally production) of the Meridian Gas Company, all, or substantially all, of which were located in Oklahoma, at a "book cost" of $1,338,406.21. Also, as of October 1, 1932, the Lone Star Gas Company "acquired" certain other properties (principally production) from the Southern Oil Production Company, located in West Texas. The book costs attributed to the acquisition of these properties was $966,-600.11. A careful examination of the record fails to reveal any necessity for the acquisition of these properties or their usefulness to the Company; or in any event the evidence is not clear and satisfactory in that regard. Mr. Hulcy, an official of the Company, gave as reason for acquiring the Meridian properties (from the parent corporation) that it was felt that they could be operated as a single unit as well as two units and that it was a logical transfer and consolidation of property. In 1931 the Company purchased 68.-32% of its gas requirement and in 1932, after the acquisition of these properties, it was still purchasing 68.27% of its requirements. And the following statement clearly shows that the Company made very little use of the production properties taken over during 1932:

| 12 Months Ended | Total Sales MCF | Total Purchases MCF | Purchases as per cent of sales. |
|---|---|---|---|
| 12/31/27 | 38,369,319 | 31,706,928 | 82.42 |
| 12/31/28 | 36,692,761 | 29,275,765 | 79.79 |
| 12/31/29 | 42,777,847 | 32,167,968 | 75.20 |
| 12/31/30 | 40,916,774 | 29,589,173 | 72.32 |
| 12/31/31 | 34,628,020 | 23,658,778 | 68.32 |
| 12/31/32 | 33,191,917 | 22,660,358 | 68.27 |
| 12/31/33 | 30,838,394 | 20,614,682 | 66.85 |
| 8/31/34 | 31,874,619 | 21,183,253 | 66.46 |

The appraisal presented by the Company before the Commission does not contain either of these properties, and neither does the appraisal presented by the Commission's experts. There is not sufficient evi-

dence in the record to warrant their consideration for any purpose. However, the Commission did consider them in its 1932 rate base by including the prorata cost of the Southern Oil and Production properties which were acquired October 1, 1932, and by setting up for the Meridian Gas Company "as a return on this property," all of the gas produced from them during 1932 at a price of fifteen cents per thousand cubic feet, in addition to the actual production expense incurred in connection with these properties during the year 1932. The amount thus allowed for the "purchase" of the gas produced from the Meridian properties was $70,227.30, which is equal to a 6% return upon $1,170,455. This was in addition to the allowance of the actual operating expenses incurred. Both of these properties are included at "book cost" in the "Commission's" rate bases set out in Table III for December 31, 1932, December 31, 1933, and March 31, 1934.

In arriving at its reproduction cost new of $73,983,405.57 (see Table IV) as of January 1, 1933, as presented in the trial court, the Company added to its valuation of its physical property the items of "Undistributed General Costs," $9,241,074, "Preliminary and Organization," $4,434,-328, "Working Capital," $1,701,600, and "Going Concern Value," $7,792,888. The sum of these items is $23,169,890. Another item going to make up the $73,983,405.57 is designated as "Final Engineering Records," $765,690.35. This latter item, when added to the $23,169,890 made a total of $23,935,580.35. If we subtract this from the total, we have left $50,047,825.22, which is only $13,393.52 more than the book costs as claimed by the Company just the day before, December 31, 1932. It should be noted that these book costs contain the following: Meridian Gas Company, $1,338,406.-21, Southern Oil Production Company, $966,600.11, and Petrolia Field investment, $758,619.23, totaling $3,063,625.55. If we subtract this $3,063,625.55 from the $50,-047,825.22 shown above, we find $46,984,-199.67 which is surprisingly close to the Commission's reproduction cost new of $46,246,617.53 at December 31, 1931.

The Commission included general overheads in the following amounts: "Administration and Legal Expense, Engineering and Supervision During Construction $2,637,264.19," "Taxes During Construction, $9,681.29," "Interest During Con-

struction, $1,650,467.52," "Preliminary and Organization Expense, $231,555.30," and "Working Capital, $1,488,369.91," et seq., totaling $6,017,338.21. These are the usual items taken into consideration in determining "Going Concern Value," which will be later discussed.

In arriving at its figure of $2,637,264.19 for "Administration and Legal Expense, Engineering and Supervision During Construction" the Commission applied 7 per cent to its reproduction cost new of the physical properties (including direct structural overheads) exclusive of leaseholds, real estate, furniture, tools, and automotive equipment. This is two and one-half per cent more than the actual cost to the Company and about five and one-half per cent more than was capitalized, the remainder having been charged to operating expenses as incurred.

### Taxes During Construction.

The Company witness Connor arrived at a figure of $173,818 for "Taxes During Construction." The witness Freese for the Commission arrived at a figure of $9,681.29, "based upon a liberal interpretation of the historical experience of the Company." That is, he took the actual amount of taxes shown by the books to have been paid and multiplied the amount by two and arrived at the figure of $9,681.29. The Commission stated with regard to this item, "Now as a matter of fact Texas and Oklahoma political subdivisions rarely tax any work of any description under construction, and in the exceptional case the tax is usually applied to materials only." The Company did not show that they had paid any such amount of taxes as claimed.

### Interest during Construction.

The Company claimed $4,975,933 for "Interest During Construction." This represents the estimated cost of interest incurred from the date of the incorporation of the Company until the property is put into operation—a period of three and one-half years. In connection with this item, the witness Connor also assumed that fifty per cent of the money required in the reconstruction of the Company's properties would be raised by the issuance of first mortgage bonds, twenty-five per cent by the issuance of preferred stock, and the balance by the issuance of common stock. He further assumed an interest rate of 8%. This assumed financial structure and interest rate is contrary to the history of the

Company, and finds no factual basis whatever in the actual experience of the Company. It has no bonded indebtedness of any character, and the debts owed are to the holding company and are evidenced by unsecured notes or open accounts.

The Commission's witness Freese used the actual construction periods as shown by the records of the Company and an interest rate of 6%, the rate actually paid by the Company.

### Preliminary and Organization Expense.

The Company witness Connor set up a claim of $4,474,272 for "Preliminary and Organization," of which $39,944 was transferred to "Production System Property," and "Preliminary and Organization" was reduced accordingly. The preliminary development and organization period was assumed by the witness Connor to be a year and a half; and his estimate of nearly four and one-half millions of dollars is not based upon any facts related in any way to the history of the Company. The actual cost to the Company for "Preliminary and Organization" was less than $232,000. The Commission, in making its allowance of $231,555.30, said, "These expenses were computed on a wholesale reproduction new basis and are somewhat greater than were historically incurred." For these expenses the Company claimed nearly twenty times as much as it actually spent.

### Working Capital.

The Company claimed $1,701,600 as its requirement for "Working Capital." The Commission found that $1,488,369.91 would be sufficient. Both the Company and the Commission computed the requirements on the primary basis of average operating expenses for forty-five days. The difference between the parties is comparatively small and arises principally from the difference in handling by them of such items as bank balances, work in progress and materials in stock held for new construction.

### Going Concern Value.

As preliminary, it may be stated that in determining the "Going Value" of the Gas Company's property, it was appropriate for the Commission to take into consideration the fact that the property subject to the rate order was only a part of the larger integrated operating enterprise. Los Angeles Gas, etc., Corp. v. Commission, 289 U.S. 287, 53 S.Ct. 637, 77 L.Ed. 1180;

**1182**

Dayton P. & L. Co. v. Commission, 292 U.S. 290, 54 S.Ct. 647, 78 L.Ed. 1267. We refer to our original opinion (86 S.W. 2d 484, 490) for the facts showing the larger operating enterprise of which the appellee Gas Company is only a department.

Suffice it to say here that the facts show that the Lone Star Gas Corporation of Delaware, which had no permit to do business in Texas, was the owner, the absolute manager, and the alter ego of appellee Gas Company and all affiliated distributing corporations; which are Texas corporations, and which under the provisions of Arts. 6051 and 6052 are required to submit themselves to the jurisdiction of the Commission and to keep in Texas books, accounts, and records required by the Commission. The Delaware holding corporation keeps only a "dummy" set of books, which are out of date, at the Dallas, Texas, central or general office; and it refused to permit an inspection of even the "dummy" set of books, upon the ground, according to its officer Hulcy, that "the books and accounts of the Lone Star Gas Corporation are not an issue in this case at all and have nothing to do with it." The holding corporation made no showing as to the "Going Concern Value" of the properties of all corporations engaged in the single integrated enterprise, nor the pro rata going value of the appellee Gas Company's property as a part of the larger single business enterprise. The Gas Company under the plan of operation is entitled to its pro rata part of the going value of the entire enterprise. It is not an independent enterprise itself. And since the Commission made a liberal allowance in the rate base of more than $6,000,000 for items which are usually considered in going concern value, the Gas Company cannot complain that its property is being confiscated because it was not allowed an extra item of $7,792,888 as going concern value. That is, the Company claimed $7,792,888 as going concern value, in addition to more than fifteen and a quarter millions of dollars claimed for such undistributed intangibles as "Executive," "Legal," "Accounting," "Treasury," "Land," "Geological," "Purchasing," "Engineering," "Supervision," "Taxes," and "Interest," under the classification of "Undistributed General Costs," and "Preliminary and Organization" and "Working Capital" under the caption of "Non-Physical Values," all of which are in addition to the structural overheads, such as "Field Supervision," "Omissions and Con-

tingencies," "Stores Expense," etc., amounting to millions of dollars which are included in "Physical" Properties in the Company's appraisal.

It was the testimony of the Commission's witness Freese that in evaluating the properties of the Company on a reproduction new basis, with a full allowance for all general overheads including administrative and legal expenses during construction, engineering and supervision during construction, interest during construction, and preliminary and organization expenses, with a further allowance for cash working capital, he had appraised the Company's properties at their full value as a going concern in full business operation. These general overheads, as included in the rate base by the Commission, amount to more than $6,000,000. In addition to this allowance in the rate base by the Commission of these items which are usually considered as elements of "Going Concern Value," it included in operating expenses the following items which it stated represented the "Cost of Securing New Business," and "Costs of developing 'an advantageously situated gas supply in excess of present maximum requirements.'" (claimed by Connor to be elements of Going Concern Value):

| | |
|---|---|
| New Business Advertising Salaries | $ 9,548.77 |
| New Business Soliciting and Expense | 27,969.98 |
| Advertising Supplies and Expense | 81,234.85 |
| New Business Supplies and Expense | 7,372.38 |
| Dry Hole Expense | 79,453.12 |
| Cancelled and Surrendered Lease Expense | 99,140.73 |
| | $304,719.83 |

This amounts to a 6% return upon more than $5,000,000. Since all of these intangibles claimed by the Company were included in its appraisal, the additional claim for nearly eight millions of dollars as "Going Concern Value" is untenable.

█ The method employed by the Commission in allowing "Going Concern Value" is fully and ably discussed in its findings of fact and is sustained by the authorities cited therein. Its experts' method of valuing all of the component parts as parts of an active, going concern, with all business fully attached, personnel trained, and all undistributed general overheads and other intangible values fully allowed for, instead of making a separate lump sum estimate of going concern value, has been often approved by the Supreme Court of the United States. Said Court has also condemned the hypothetical method employed by the Gas

Company. And where, as in the instant case, the going value claimed has no basis in the actual history of the company; and where because the company is a part of a larger affiliated enterprise or system, which would tend to reduce such expenses in the reproduction cost new of the property, the lump sum should not be allowed. Dayton Power & Light Co. v. Commission, 292 U.S. 290, 54 S.Ct. 647, 78 L.Ed. 1267; Los Angeles G. & E. Corp. v. R. R. Com. of Cal., 289 U.S. 287, 302, 303, 313-319, 53 S.Ct. 637, 77 L.Ed. 1180, 1191, 1196-1200, and cases there cited and reviewed; and also in St. Joseph Stockyards Company v. United States, 298 U.S. 38, 62-64, 56 S.Ct. 720, 80 L.Ed. 1033, 1047, 1048. And see especially Columbus G. & E. Co. v. Pub. Ut. Com., 292 U.S. 398, 410-413, 54 S.Ct. 763, 78 L.Ed. 1327, 1334.

### Material Prices.

The largest item of physical property is transmission line pipe, the cost of which delivered at sidings the Company estimated to be $20,954,471.01 at January 1, 1933. As the basis of obtaining prices on pipe, as well as practically all other items of physical equipment, the Company's witnesses (Biddison and Richey) claimed to have obtained from leading manufacturers quotations of the prevailing prices, with all applicable discounts applied. The Commission's witness Freese testified that his investigation showed that large lot purchases could be obtained at prices 10% to 15% or more below quoted prices. The Commission's findings of fact disclose that quoted prices from the leading manufacturers were identical and far above the prices obtained by the Company in actual purchases. The Company, in its estimate, did not take full advantage of all discounts available to it. A good example of the results of the use of "quoted" prices rather than actual prices being currently paid (where actual prices are available) is the fact that the Company used in its appraisal a "quoted" price of $3 per foot on more than a mile of 24" pipe which was actually purchased in 1933 for approximately $2 per foot.

### Excavation Costs.

Next to the cost of pipe, the cost of excavation was the largest item going to make up the total cost of transmission line equipment. The total yardage of excavation estimated by the Company's witnesses was 3,375,162.9 cubic yards. Of this total yardage, more than eighty per cent was estimated as to volume and classified as ma-

chine, rock, and hand earth excavation by what is known as the "barring method" of estimating trench depths and types (rock or earth) of excavation. The Commission questioned the accuracy of the results obtained by the use of the "barring method" and developed testimony to support its contention.

For example, there was cited the case where two transmission lines were laid parallel and less than one hundred feet apart for a distance of sixty-two miles. One of the lines (Line B) was laid about 1910 and the other (Line Second B) was constructed in 1929. There were no construction records available on the older line, but records were available on the newer line. Cross-examination of the Company witness Steinberger disclosed that the barring method used on the old line (Line B) produced an estimate of 11.97% hand earth excavation, 11.11% of hand rock excavation, and 76.92% machine. However, as compared with these estimates, the actual construction records revealed that on the new line (Line Second B) the percentages were: Hand earth excavation, .83%, hand rock excavation, 9.07%, and machine excavation, 90.10%. Thus the hand earth excavation estimated on Line B was more than fourteen times as great as the hand earth excavation actually encountered on Line Second B. The costs per cubic yard of various types of excavation used by the Company were as follows: machine, $.4260, hand earth in stretches of more than two hundred feet, $1.31, hand earth excavation on "skips" or "lifts" of less than two hundred feet $2.138, rock excavation in Texas, $3.897, rock excavation in Oklahoma, $3.826. The importance of properly classifying excavation into the various types is apparent. The Company's unit cost per cubic yard of the cheapest type of hand earth excavation is more than three times as high as the unit cost per cubic yard of machine excavation.

Mr. Freese, the engineering witness for the Commission, testified that if the Company had determined the classification of the yardage by actual measurements and had applied the unit costs used by their own witness Biddison to the yardage so determined instead of the classification used by Biddison (and determined by the "barring method") that the cost of excavation as shown in the Company's appraisal would have been reduced in the approximate amount of $600,000. The witness Freese applied the following unit prices to the var-

ious classes of excavation: Machine, $.375 per cubic yard; hand earth, $1.31; rock, $3.50. The Commission also used as witnesses two contractors; one of whom (Mr. Robinson) lived in San Antonio, Texas, and had done much excavation work in the area traversed by the Company's transmission lines. The other (Mr. Dobson) resided in Lincoln, Nebraska, but had done excavation work in many sections of the country, including Texas. He is a graduate civil engineer with twenty-four years experience in construction work, and at the time of the trial testified that he owned thirty trenching machines. Both of these witnesses were carried over the system and furnished specifications describing the manner in which the excavation had been classified. Robinson estimated machine excavation at $.40 per cubic yard, hand excavation at $1.20, and rock at $2.90. Dobson (apparently the best qualified of all of the witnesses regarding excavation costs) estimated machine excavation at $.285 per cubic yard, hand excavation at $1.41 per cubic yard, and rock excavation at $4. per cubic yard. These witnesses would have been glad to have done the work at the prices testified to by them. A similar controversy as to excavation costs arose before the Commission. Five contractors of wide experience (including Messrs. Dobson and Robinson) testified for the Commission concerning excavation and backfill costs. The Commission adopted substantially the highest unit costs in each classification testified to by any of the five witnesses. The findings of fact by the Commission concerning these items are fully and fairly sustained by the evidence.

## Gas Reserves.

The Company book cost of Production System Property at December 31, 1932, was $5,604,756.76, including the Petrolia Field investment and the production properties acquired during 1932 from the Meridian Gas Company and the Southern Oil Producing Company. The Production System Property as set up in the Company's appraisal at January 1, 1933, introduced in District Court as part of Ex. 28, is over $3,500,000 more than book cost. Of the total of $9,141,858.05, thus claimed by the Company, $148,596 is designated as "General Supervision Allocated," $1,404,643.25 is labeled "Undistributed General Costs." The other items are "Developed Leaseholds," $2,681,689, "Undeveloped Leaseholds," $893,291.28, "Gas Wells," $3,908,-

424.15, "Other Production System Structures," $9,450.29, and "Other Production Equipment," $95,764.08. The two items of "General Supervision Allocated" and "Undistributed General Costs" account for $1,-553,239.25 of the excess of the appraised figures over the book cost figures. The principal portion of the balance of the excess, amounting to approximately two millions of dollars is included in the items of "Leaseholds" and "Gas Wells." We cannot refrain from here observing that the items of "General Supervision Allocated" and "Undistributed General Costs" are speculative, visionary, imaginary, and are purely hypothetical expenses of financing the reproduction of a business, which find no support whatever in the history or experience of the appellee Gas Company, and do not constitute clear and satisfactory evidence of such expenses or values. Dayton P. & L. Co. v. Commission, supra.

Gas Reserve is an important item of Production System Property. The average price paid by the Company for gas in Texas and Oklahoma was slightly in excess of six cents per MCF. The average prevailing field price in the fields where the Company produced gas was less than five cents per MCF. The Company apparently claimed as annual expenses in connection with the production of gas:

| | |
|---|---:|
| Depletion of Developed Leaseholds | $146,000.00 |
| Depletion and Depreciation of Gas Well Equipment | 421,316.00 |
| Production System Expenses | 105,554.86 |
| Cancelled and Surrendered Lease Expense | 188,629.92 |
| 10% Return on Reproduction Cost of Production System Properties | 914,185.81 |

making a total of $1,775,686.59, which they would show as the cost to produce the 6,046,035 MCF of gas which the record shows was produced in 1933. This amounts to an average price per MCF, in the field, of 29.37 cents as compared with the actual average purchase price of "about six and one-third cents per thousand cubic feet" (Hulcy) over the years 1927 through 1931. The average price was less than six and one-third cents for 1932 and 1933. The highest price paid for gas in the field was fifteen cents per MCF to the parent Lone Star Gas Corporation. Unlimited quantities of gas could have been purchased by the Company in the Panhandle fields of Texas at two cents per MCF.

Mr. Hulcy, an officer of the Company, presented in evidence in the trial court an appraisal of gas reserves based essentially upon the principle of capitalization of fu-

ture earnings. In this connection he assumed future annual rates of withdrawals at four or five times the rates prevailing up to the time of the trial. If the rates of the Company's withdrawals from its own reserves are assumed to increase by three or four hundred per cent in the future, then it would have to also be assumed that the revenues to the Company would increase accordingly, or that Gas Purchase Expense would proportionately decrease. Mr. Hulcy made neither of these latter assumptions.

The Commission, in its order, allowed $4,699,205.51 as the fair value of Production System Properties (including overheads) at December 31, 1931, which is only $190,545.73 less than the Company's undepreciated book cost at the same date. These undepreciated book costs contain Undeveloped Leaseholds in the amount of $1,263,871.38. The evidence does not show when, if ever, these undeveloped properties will become used and useful and does not warrant their inclusion on the rate base. It is therefore clear that the Commission has included in its findings of fair value at December 31, 1931, of Production Properties approximately a million dollars ($1,073,325.65) more than a strict interpretation of the law and evidence in the case would require. For subsequent years the "Commission's" Production System Properties are represented by its findings at December 31, 1931, plus subsequent additions at cost to the Company, including the cost of the production properties acquired from the Lone Star Gas Corporation, known as the Meridian Gas Company properties, and also the production properties acquired from the Southern Oil and Production Company, these additions at cost amounting to nearly a million dollars. Obviously, the Commission's findings were very liberal to the Company.

But notwithstanding the fact that these after acquired production properties and undeveloped leaseholds were not shown to be used nor useful in the reasonably near future, they have been included in the calculations of Table III, thus adding some million dollars to the rate base which could have been properly excluded. Columbus G. & F. Co. v. Commission, 292 U.S. 398, 54 S.Ct. 763, 78 L.Ed. 1327.

## Revenues.

There is no material difference between the parties with regard to estimates of future revenues except as pertains to the matter of making adjustments (to rectify the results of abnormally hot weather) in the volume of gas sold for heating purposes. The Commission introduced temperature adjustments in the district court (see Table III).

The record shows that the year 1933 was the warmest year in the history of the Company; and the parties are agreed that the economic depression and these high temperatures of 1933 were contributing factors to the slump in revenues from 1930 to the end of 1933. The twelve months ended March 31, 1934, reflect the beginning of the up-swing (see Table III). The revenues for the year 1933 and the twelve months ended March 31, 1934, are less by a million dollars than the annual average covering the seven years 1927 through 1933 and the twelve months ended March 31, 1934 (Table III). The revenues for the year 1931 were nearly one and one-half million dollars less than those for the year 1930. A considerable part of this loss of revenue occurred in connection with the industrial gas sales. However, by 1934, the evidence reflected an upturn in business and revenues for the twelve months ended March 31, 1934. And manifestly the annual revenues averaged over a reasonable number of years, including both prosperous and lean years (see Table III), is a better guide for the future than the record of only the lean years 1931, 1932 and 1933, as submitted by the Company in the trial court (see Table IV).

## Depreciation.

The Company claimed an annual allowance of $3,427,278 before the Commission for Depreciation, Depletion, and Amortization, the annual rates ranging from 1% on Taxes During Construction to 25% on General Tools (Table II). In the trial court, the Company claimed an annual amount of $3,465,113.36 (Table IV). Before the Commission, the Company used an interest rate of 7% in applying the sinking fund method of spreading the accruals. In the trial court they used 5%. As the rate of interest applicable to the balances is reduced, the annual requirements are increased. The reduction of the interest rate from 7% before the Commission to 5% in the trial court accounts in part for the increase in the Company's estimated annual requirements in the trial court. The $3,022,597.54 claimed as necessary annually to take care of Depreciation and

Depletion of the direct structural costs of all of its public service properties in Texas and Oklahoma as contained in the appraisal at January 1, 1933, submitted in the trial court, is approximately 6% of such reconstruction new costs as shown by the appraisal. This claim of nearly 6% per annum by the Company, when compared with their witness Biddison's testimony that the properties had depreciated only 5.74% during their entire life places the Company in an untenable position with regard to depreciation. This becomes even more apparent when it is considered further that the Company witness Biddison testified that there had been practically no change in the condition of the properties during the last two years under consideration in the trial court; and when it is further considered that the actual charges to the Reserves (cost of replacements) averaged over the seven-year period, 1927 through 1933, amounted to only $344,871.84 per annum (Table III).

The Commission found that $983,698.43 would be sufficient annually to cover Depreciation, Depletion, and Amortization. It used the sinking fund method and a six per cent interest rate, both in its order and in the trial court. The amount found by the Commission is nearly three times as much as the actual net charges to the reserves. The Company claims more than ten times this amount. The Commission was very liberal in its allowance for depreciation.

### Expenses.

In the hearing before the Commission and in the trial court, the Company claimed Expenses of $4,394,710.63 for the year 1931, $3,849,543.45 for 1932, and $3,712,161.24 for the twelve months ended April 30, 1933, or an average annual amount of $3,985,471.77.

The Commission eliminated from the 1931 Expenses, Management Fees in the amount of $91,375.38, and Cancelled and Surrendered Lease Expenses in the amount of $140,090.23; and increased Dry Hole Expense by $13,581.56. The Commission found $4,174,807.47 as a proper allowance for operating expenses for the year 1931. Management Fees were properly eliminated by the Commission as improper charges to public service operations. See our former opinion, 86 S.W.2d 484. The adjustments made by the Commission in the cases of Dry Hole Expense and Cancelled and Surrendered Lease Expense resulted

from the fact that five-year averages were adopted for these expenses rather than those for the year 1931. These expenses were shown to fluctuate widely from year to year. The five-year period was the better test period.

The items of "Subscriptions and Donations," $20,215.94; "Charitable Donations," $9,848.67; "Advertising Supplies and Expenses," $81,234.85; and "Maintenance of General Structures," $24,650.71, were questioned but allowed. The Commission's allowances to Operating Expenses were very liberal.

The facts above detailed fully justify the conclusion that the Commission's rate base represents even more than the fair value of the Gas Company's property used in the public service; that the Commission has made liberal allowances for every character of operating expense, including a rate of depreciation sufficient to recapture the Gas Company's entire original investment; and that the Gas Company has been and will be in the future afforded a fair rate of return, which does not approach even the border line of confiscation, and which rate of return we will now discuss.

### Rate of Return.

The Company through its expert witness claimed that a net return, after Federal Income Tax, of from 8% to 15% would be necessary to enable it to survive and operate successfully. In fairness no one can honestly contend that the Company has not survived and operated successfully on the 40¢ rate. The testimony of the Company's witness is that the book costs increased from $4,741,620.41 at the middle of 1910 to $47,776,749.63 at the end of 1931—an increase of more than one thousand per cent. The "Amount Available for Depreciation and Return" increased from $57,607.99, for the twelve months ended May 31, 1910, to $4,605,721.83 for the year 1931—an increase of nearly eight thousand per cent. Throughout its life, the Company has enjoyed a free flow of capital at interest rates no higher than 6% and in some instances lower.

Directly opposed to these facts, the Company attempts to show (Tables II and IV) that under the 40¢ rate, voluntarily fixed and adhered to by it for many years, its rate of return has never been as much as 3% on its book cost and never as much as 2% on its reproduction cost new. If, as the Company's experts contend, net returns of from 8% to 15% (after Federal Income Tax) are essential to the Company's sur-

vival and successful operation, then how has the Company been able to multiply its property more than ten fold and its "Amount Available for Depreciation and Return" nearly eighty fold during its comparatively brief existence..

In fact, during its entire life and through the year 1931, the Company enjoyed under the ".Amount Available for Depreciation and Return," when expressed as a weighted per cent of the book cost, 12.03%. The rates of return vary widely, ranging from less than 2% back in 1910 to more than 17% in 1926, but at no time since the first full year of operation have they fallen below 7%. Obviously, in estimating the rate of return for the future, reason and justice would not authorize taking the 17.26% as shown for 1926, or the 11.10% as shown for 1930, or the 9.54% as shown for 1922, or\for any other one year; but would require that enough of the history of the past be reflected in a prediction for the future to cause the prediction to represent the normal rather than the abnormal. The Commission adopted a sufficient test period, and its action in so doing is sustained by the authorities. United States Gas Pub. Serv. Co. v. State of Texas, 303 U.S. 123, 58 S.Ct. 483, 82 L.Ed. 702; West Ohio Gas Co. v. Public Ut. Comm. of Ohio, 294 U.S. 79, 55 S.Ct. 324, 79 L.Ed. 773; and West Ohio Gas Co. v. Public Ut. Comm. of Ohio, 294 U.S. 63, 55 S.Ct. 316, 79 L.Ed. 761.

The Company, however, both in the hearing before the Commission (Table II) and in the trial in district court (Table IV) presented only the "lean" years beginning with 1931, and attempted the impossible task of making normal predictions for the future on the basis of the short and abnormal period used. Thus the Company failed to present clear and satisfactory showing that the rate of return was too low, as was its burden.

The Commission found an annual return of 6% to be fair and reasonable. A study of Table III will show that under the 32-cent rate as set by the Commission; and Depreciation, Depletion, and Amortization calculated on the basis as found by the Commission, the rates of return on the average book costs rate bases vary from 11.01% in 1927 to 5.18% for the twelve months ended March 31, 1934, and average approximately 7%. When these same conditions are applied to the rate bases as found by the Commission, the rates of return vary from 5.-40% to 11.01% and average .7.13% for the period. If these conditions are changed to the extent of using the actual average costs per annum of making replacements during the past seven years in the place of the too liberal allowances for Depreciation, Depletion, and Amortization made by the Commission, the rates of return upon the average book costs vary from 6.48% to 11.97% and average 8.28%. If these latter conditions are applied to the rate bases as found by the Commission, the rates of return range from 6.76% to 11.97% and average 8.46% per annum over the test period.

A 6% rate of return has been held not confiscatory in the following cases: Willcox v. Consolidated Gas Co., 212 U.S. 19, 48, 50, 29 S.Ct. 192, 53 L.Ed. 382, 15 Ann. Cas. 1034, 48 L.R.A.,N.S., 1134; Cedar Rapids Gas Light Co. v. Cedar Rapids, 223 U.S. 655, 670, 32 S.Ct. 389, 56 L.Ed. 594; Des Moines Gas Co. v. Des Moines, 238 U. S. 153, 172, 35 S.Ct. 811, 59 L.Ed. 1244. See, also, Stanislaus County v. San Joaquin & King's River C. & I. Co., 192 U.S. 201, 216, 24 S.Ct. 241, 48 L.Ed. 406; West Ohio Gas Co. v. Public Utilities Com., 128 Ohio St. 301, 191 N.E. 105, 115; State ex rel. Capital City Water Co: v. Public Service Comm. of Missouri, 298 Mo. 524, 252 S.W. 446, 454–459.

Since the computations in Table III show that when the more than seven-year period used in the trial court is considered, the Gas Company has earned an average rate of return of from 6.98% to 8.48%, and we are clear in the view that the rate order is based upon substantial evidence, and that the Gas Company did not show by clear and satisfactory evidence that it was not based upon substantial evidence, or that it would not afford a reasonable rate of return on the fair value of the properties used or useful in the public service.

We conclude that the validity of the 32-cent city gate rate prescribed by the Commission is (1) conclusively established as a matter of law, and (2) factually from so overwhelming a weight and preponderance of the evidence as to require a reversal in the interest of justice.

The judgment of the trial court declaring the rate order invalid is reversed; the injunction restraining its enforcement is dissolved; and the city gate rate of 32 cents fixed by the Commission is declared to be just, reasonable, non-confiscatory, and valid in every particular.

Judgment Reversed; Injunction Dissolved; Gate Rate Prescribed by Commission Declared Valid.

# TABLE I.

## CALCULATION OF RATE OF RETURN—YEAR 1931
### TEXAS AND OKLAHOMA OVERALL OPERATIONS—32¢ DOMESTIC GATE RATE
### BASED UPON FINDINGS OF THE RAILROAD COMMISSION OF TEXAS
### EXCLUDING EARNINGS FROM GOVERNMENT AND NORTHERN NATURAL AND USING UNDEPRECIATED
### RATE BASE WHICH INCLUDES PRODUCTION PROPERTIES. ALSO SHOWING RATE BASES
### AND RATES OF RETURN FOR REMAINING YEARS OF TEST PERIOD AS FOUND BY
### COMMISSION IN ITS FINDINGS OF FACT?

(The Revenues, Expenses, Depreciation, etc. For the Years 1927 Through 1930 were considered by the Commission but excluded by the Trial Court—hence not shown here)

### FOR THE TWELVE MONTHS ENDED

| | Dec. 31, 1927 | Dec. 31, 1928 | Dec. 31, 1929 | Dec. 31, 1930 | Dec. 31, 1931 | Dec. 31, 1932 | Six Year Average |
|---|---|---|---|---|---|---|---|
| Revenues | | | | | $ 9,301,862.65 | | |
| Less Adjustment to Reduce Domestic Sales to 32¢ Per MCF | | | | | 1,361,894.96 | | |
| Adjusted Revenues (Domestic Sales @ 32¢) | | | | | 7,939,967.69 | | |
| Expenses | | | | | 4,174,807.47(1) | | |
| Available for Depreciation, Depletion, Amortization, Income Tax and Return | | | | | 3,765,160.22 | | |
| Depreciation, Depletion and Amortization | | | | | 983,698.43(2) | | |
| Available for Fed. Income Tax & Return | | | | | 2,781,461.79 | | |
| Federal Income Tax | | | | | —— (5) | | |
| Available for Return | | | | | 2,781,461.79 | | |
| Rate Base as Found by Commission (R. 7. pp. 3921, 4016) | $29,517,879.08 | $35,661,928.96 | $41,340,023.12 | $46,745,646.84 | 46,246,617.53(3) | 46,520,137.05 | |
| Rate of Return on Rate Base Found by Commission | 11.42% | 9.70% | 9.83% | 7.46% | 6.02%(4) | 6.34% | 8.46%(6) |

(1) Contains the following items which unquestionably should have been eliminated by the Commission: Subscriptions and Donations $20,215.94, Charitable Donations $9,848.67; and contains other items totaling $329,370.54, large portions of which were questioned by the Commission. For example, the Commission (page 9 of its opinion and order R. 7. p. 3851) in allowing the $81,234.85 for Advertising Supplies and Expenses, claimed by the Company, said "The only example of advertising done by the Lone Star Gas Company, or by the affiliated distributing companies, and which was cited in the record, was headed '60 cents of every gas bill goes for taxes'. Advertising expense incurred for political purposes is not a legitimate charge against the public service operations of the Lone Star Gas Company. Although we are allowing the full amount set forth above for advertising supplies and expense, we do so reluctantly, (1) for the reason that any expenditure for advertising to increase sales should have been made by the distributing and not by the transmission company, and (2) for the reason that any expenditure for influencing policies of legislation is not a proper charge to operating expenses, the record failing to disclose what portion, if any, of the expenditure was of an allowable nature."

(2) Although the Commission is setting up an annual accrual to these reserves in the amount of $983,698.43, the actual average annual charge during the seven years under review (1927 thru 1933) was only $344,871.84.

(3) Contains undeveloped leaseholds in the amount of $1,263,871.38. The Company was purchasing more than 70% of its gas requirements and the record does not show when (if ever) the undeveloped leaseholds will become used and useful.

(4) If the items of Subscriptions and Donations and Charitable Donations (in the sum of $30,064.61—see footnote #1) were eliminated from Operating Expenses and if the actual costs of $344,871.84 (see footnote #2) were used for Depreciation, Depletion and Amortization instead of the Commission's findings of $983,698.43, and if Undeveloped Leaseholds were excluded from the rate base (see footnote #3) the amount available for return would be $3,450,352.99, the rate base would be $44,982,746.15, and the rate of return would be 7.67%. Also with respect to revenues, the Commission could have included the revenues from the Government and Northern Natural but excluded them on the ground that they were not permanent enough to warrant their consideration for the fixing of future rates; but the Commission did make calculations based upon these revenues which show much higher rates of return than are shown in TABLE I. (R. 7. p. 3848)

(5) R. 7. p. 3916.

(6) Straight Average—Weighted Average not available.

**TABLE II.(2)**

## CALCULATION OF RATE OF RETURN
### TEXAS AND OKLAHOMA PRODUCTION AND TRANSMISSION OPERATIONS
### BASED UPON COMPANY'S EVIDENCE BEFORE THE COMMISSION
### 40¢ DOMESTIC GATE RATE

FOR THE TWELVE MONTHS ENDED

| | Dec. 31, 1927 | Dec. 31, 1928 | Dec. 31, 1929 | Dec. 31, 1930 | Dec. 31, 1931 | Dec. 31, 1932 | Apr. 30, 1933 |
|---|---|---|---|---|---|---|---|
| Revenues | None Submitted | None Submitted | None Submitted | None Submitted | $ 9,302,734.87 | $ 8,851,885.18 | $ 8,513,429.46 |
| Expenses | " | " | " | " | 4,394,710.63 | 3,849,542.45 | 3,712,161.24 |
| Available for Depreciation, Depletion, Amortization, Fed. Income Tax & Return | " | " | " | " | 4,908,024.24 | 5,002,341.73 | 4,801,268.22 |
| Depreciation, Depletion and Amortization | " | " | " | " | 3,427,278.00 | 3,609,408.95(1) | 3,583,341.53(1) |
| Available for Income Tax and Return | " | " | " | " | 1,480,746.24 | 1,392,932.78 | 1,217,926.69 |
| Federal Income Tax | " | " | " | " | 302,302.41 | 343,835.27 | 316,583.40 |
| Available for Return | " | " | " | " | 1,178,443.83 | 1,049,097.51 | 901,343.29 |
| Rate Base—Book Costs | " | " | " | " | 47,776,749.63 | 50,034,431.70 | 49,976,869.27 |
| Rates of Return on Book Costs | " | " | " | " | 2.47% | 2.10% | 1.80% |
| Rate Bases—Reproduction New | " | " | " | " | 73,927,635.43 | None Submitted | None Submitted |
| Rates of Return on Reproduction New | " | " | " | " | 1.59% | | |

(1) The $3,427,278.00 claimed by the Company (their Ex. #21 before the Commission) as its annual requirements for Depreciation, Depletion and Amortization (As based upon the Reproduction Cost New estimate of the Company of $73,927,635.43 shown by their Ex. #6 before the Commission at December 31, 1931) is 7.17% of the "Book Cost" Rate Base of $47,776,749.63 at December, 31, 1931, as claimed by the Company in their Ex. #1 before the Commission. The 7.17% has been applied to the Company's "Book Cost" Rate Bases at December 31, 1932, and at April 30, 1933.

(2) Company's estimates and calculations before the Commission used here for purposes of comparison only.

**TABLE III.**

## CALCULATION OF RATES OF RETURN

### TEXAS AND OKLAHOMA PRODUCTION, GATHERING AND TRANSMISSION OPERATIONS
### BASED UPON EVIDENCE USED BY THE COMMISSION IN THE DISTRICT COURT
### DOMESTIC SALES ADJUSTED TO 32¢ GATE RATE
### RATE BASES UNDEPRECIATED

FOR THE TWELVE MONTHS ENDED

| | Dec. 31, 1927 | Dec. 31, 1928 | Dec. 31, 1929 | Dec. 31, 1930 | Dec. 31, 1931 | Dec. 31, 1932 | Dec. 31, 1933 | Mar. 31, 1934 | Annual Average |
|---|---|---|---|---|---|---|---|---|---|
| Revenues | $ 9,020,274.96 | $ 9,541,976.32 | $11,088,338.49 | $10,752,143.01 | $ 9,301,882.65 | $ 8,859,188.20 | $ 7,728,309.05 | $ 7,965,978.89 | $ 9,282,258.94 |
| Less Adjustment to Reduce Domestic Sales to 32¢ Per MCF | 973,702.96 | 1,199,373.20 | 1,414,553.76 | 1,437,941.36 | 1,361,894.96 | 1,332,135.04 | 1,115,586.64 | 1,151,152.40 | 1,248,292.54 |
| Adjusted Revenues (Domestic Sales @ 32¢) | 8,046,572.00 | 8,342,603.12 | 9,673,784.73 | 9,314,201.65 | 7,939,987.69 | 7,527,053.16 | 6,612,722.41 | 6,814,826.49 | 8,033,966.40 |
| Expenses (Less Management Fees and Donations) (R. 6, pp. 3596, 3606-07) | 3,979,878.47 | 3,972,592.29 | 4,640,581.22 | 4,923,066.76 | 4,174,807.47(1) | 3,751,172.07 | 3,517,900.39 | 3,491,368.82 | 4,056,420.93 |
| Available for Depreciation, Depletion, Amortization, Income Tax and Return | 4,066,693.53 | 4,370,010.83 | 5,033,203.51 | 4,391,134.89 | 3,765,160.22 | 3,775,881.09 | 3,094,822.02 | 3,323,457.67 | 3,977,545.47 |
| Depreciation, Depletion and Amortization | 627,865.95(2) | 758,554.19(2) | 879,331.23(2) | 994,312.63(2) | 983,698.43 | 1,031,720.41(2) | 1,027,521.45(2) | 1,028,281.56(2) | 916,410.73 |
| Available for Federal Income Tax and Return | 3,438,827.58 | 3,611,456.64 | 4,153,872.28 | 3,396,822.26 | 2,781,461.79 | 2,744,160.68 | 2,067,300.57 | 2,295,176.11 | 3,061,134.74 |
| Federal Income Tax | 188,810.12 | 188,343.89 | 233,858.45 | 124,376.47 | — (7) | — | — | — | 91,923.61 |
| Available For Return | 3,250,017.46 | 3,423,112.75 | 3,920,013.83 | 3,272,445.79 | 2,781,461.79 | 2,744,160.68 | 2,067,300.57 | 2,295,176.11 | 2,969,211.13 |
| Add Temperature Adjustment—Texas Only (R. 6, p. 3686) | — | — | — | — | — | — | 513,768.97 | 313,018.52 | 103,348.44 |
| Available For Return—Adjusted | 3,250,017.46 | 3,423,112.75 | 3,920,013.83 | 3,272,445.79 | 2,781,461.79 | 2,744,160.68 | 2,581,069.54 | 2,608,194.63 | 3,072,559.57 |
| Rate Bases—Average Book Costs (R. 6, p. 3617) | 29,517,879.08 | 35,661,928.96 | 41,340,023.12 | 46,745,646.84 | 48,409,092.24 | 49,484,884.66 | 50,399,110.82 | 50,399,110.82 | 43,994,695.81 |
| Rate of Return on Book Costs | 11.01% | 9.60% | 9.48% | 7.00% | 5.75% | 5.55% | 5.12% | 5.18% | 6.98%(3) |
| Rate Base (Found By Comm. Dec. 31, 1927, 1928, 1929, 1930 and 1931. The Rate Bases shown here at Dec. 31, 1932 and 1933 and Mar. 31, 1934 represent the Commission's 1931 Rate Base Plus Additional Property purchased as Claimed by the Company.) | 29,517,879.08 | 35,661,928.96 | 41,340,023.12 | 46,745,646.84 | 46,246,617.53 | 48,504,299.60 | 48,306,893.96 | 48,342,628.99 | 43,083,239.76 |
| Rate of Return on Commission Rate Bases | 11.01% | 9.60% | 9.48% | 7.09% | 6.01% | 5.66% | 5.34% | 5.40% | 7.13%(4) |

Rates of Return on Average Book Costs—Determined by the Use of all factors shown above except that the actual average charges to the Reserves ($344,871.84) are used instead of the "Commission's" Depletion, Depreciation & Amortization. (R 6. pp. 3618-19 for Charges to Reserves)

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 11.97% | 10.76% | 10.78% | 8.39% | 7.07% | 6.83% | 6.48% | 6.53% | 8.28%(5) |

Rates of Return on "Commission" Rate Bases—Determined by the Use of all factors shown above except that the actual average charges to the Reserves ($344,871.84) are used instead of the "Commission's" Depletion, Depreciation and Amortization. (R 6. pp. 3618-19 for charges to Reserves)

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 11.97% | 10.76% | 10.78% | 8.39% | 7.40% | 7.07% | 6.76% | 6.81% | 8.46%(6) |

(1) 1931 Operating Expense contains Donations but has Dry Hole Expense and Cancelled and Surrendered Lease Expense adjusted to the average of the 5 years ended December 31, 1931. (R 7. pp. 3850, 3854)

(2) The 1931 Depreciation, Depletion and Amortization as found by the Commission ($983,698.43) is 2.12707% of the 1931 rate base found by the Commission ($46,246,617.53). This per cent has been applied to the "Commission's" rate bases of the other years.

(3) Weighted Average—the straight average is 7.34%.
(4) Weighted Average—the straight average is 7.44%
(5) Weighted Average—the straight average is 8.61%
(6) Weighted Average—the straight average is 8.74%
(7) (R 7. pp. 3916-17)

1192

TABLE IV.

## CALCULATION OF RATES OF RETURN
### TEXAS AND OKLAHOMA PRODUCTION, GATHERING AND TRANSMISSION OPERATIONS
### BASED UPON THE COMPANY'S EVIDENCE IN THE DISTRICT COURT
### DOMESTIC SALES AT 40¢ GATE RATE

FOR THE TWELVE MONTHS ENDED

| | Dec. 31, 1927 | Dec. 31, 1928 | Dec. 31, 1929 | Dec. 31, 1930 | Dec. 31, 1931 | Dec. 31, 1932 | Dec. 31, 1933 | Mar. 31, 1934 | May 1, 1934 |
|---|---|---|---|---|---|---|---|---|---|
| Revenues ......... | None Submitted | " | " | None Submitted | $ 9,302,734.87(1) | $ 8,851,886.18(2) | $ 7,751,365.23(5) | $ 7,989,898.76(7) | $ 7,985,668.54(9) |
| Expenses ............. | " | " | " | " | 4,394,710.63(1) | 3,849,543.45(2) | 3,635,285.31(5) | 3,610,457.27(7) | 3,612,884.03(9) |
| Available For Depreciation, Depletion, Amortization, Federal Income Tax and Return | | | | | 4,908,024.24 | 5,002,341.73 | 4,116,079.92 | 4,879,441.49 | 4,372,804.51 |
| Depreciation, Depletion and Amortization | " | " | " | " | None Submitted(12) | 3,465,113.36(4) | None Submitted(12) | None Submitted(12) | None Submitted(12) |
| Available For Fed. Income Tax and Return | | | | | | 1,537,228.37 | | | |
| Federal Income Tax | " | " | " | " | 302,302.41(1) | 343,835.27(2) | 223,331.34(5) | 259,297.97(7) | 258,481.70(9) |
| Available For Return | " | " | " | " | | 1,193,393.10 | | | |
| Rate Bases — Per Books ........... | " | " | " | " | 47,776,749.63(1) | 50,034,431.70(2) | 49,837,026.06(6) | 49,872,761.09(8) | 49,858,751.23(10) |
| Rates of Return ....... | | | | | | 2.39% | | | |
| Rate Bases—Reproduction New ...... | " | " | " | " | None Submitted | 73,983,405.57(3) | None Submitted | None Submitted | 75,562,787.29(11) |
| Rates of Return..... | | | | | | 1.61% | | | |

(1) (R. 7. p. 3936)
(2) (R. 7. p. 3941)
(3) (R. 7. p. 4116 et seq.)
(4) (R. 3. p. 1906 et seq. R. 10, pp. 9252-54)
(5) (R. 7. p. 3951)
(6) (R. 7. pp. 3952-53)
(7) (R. 7. p. 3956)
(8) (R. 7. pp. 3957-58)
(9) (R. 7. p. 3961)
(10) (R. 7. pp. 3962-63)
(11) (R. 10. p. 9241 et seq.)

(12) The Company submitted no estimates or calculations which in themselves could be used, but attempted to use the Commission's estimates and calculations as shown in its findings of fact which attempts do not fairly present the calculations made by the Commission but present rather a criticism of such estimates and calculations of the Commission by the Company.

## Concurring Opinion.

PER CURIAM.

We deem advisable further comment, as brief as the subject will admit, upon the issues reiterated in the very able printed argument in support of appellee's motion for rehearing.

Two main contentions are urged in the argument.

1. It is contended that since R.C.S.Art. 6059 provides for judicial review to determine whether rate orders of the Commission are unreasonable and unjust to the complaining party, and since the trial therein provided is the same as in other civil cases, our decision upholding the Commission order on the ground that it is supported other than by conclusive evidence does violence to this article under which the proceeding was brought.

■ Manifestly, this question, involving as it does, only the proper construction of a state statute, is one solely for the state courts, and contains no element which would confer jurisdiction upon the Federal courts.

■ As pointed out in Justice BLAIR'S opinion, the proper construction of this article, its prototype Art. 6453, and similar statutes of this state providing for this character of judicial review of administrative orders, has been frequently before our courts, and it is now the established law of this jurisdiction that the factual review of such orders extends only to the question whether they have substantial support in the evidence. In other words, while the trial is de novo, the issues are substantially the same as those in certiorari proceedings.

■ ■ Moreover, if need there were for further adjudication, the question was foreclosed in so far as this case in this court is concerned by our Supreme Court's refusal of an application for writ of error from our former judgment in this case. That decision rendered our judgment final and immune from attack, save only as regards the issue of the asserted denial of due process under the Federal Constitution. After that decision, only federal questions were left open for review, of which the proper construction of the Texas statute was not one.

2. It is contended that our present decision, in so far as it renders judgment upholding the order as against the verdict of the jury and judgment thereon of the trial court, is in conflict with the Ben Avon case, Ohio Valley Water Co. v. Ben Avon, 253 U.S. 287, 40 S.Ct. 527, 64 L.Ed. 908, and Stockyards decision, St. Joseph Stock Yards Co. v. United States, 298 U.S. 38, 56 S.Ct. 720, 80 L.Ed. 1033, of the Federal Supreme Court and the decision of that court in this case.

This court had under consideration the opinion of the Federal Supreme Court in this case for several months, aided by able and exhaustive briefs of the respective parties. Determination of the exact basis upon which that opinion was grounded presented a question of no little difficulty. Its final resolution to the effect that the Federal decision was based upon the fact that our former judgment was erroneous in that it applied an untenable theory, was impelled by several considerations which we will briefly consider.

The Laredo case, United Gas Public Service Co. v. State, Tex.Civ.App., 89 S. W.2d 1094, affirmed, Id., 303 U.S. 123, 625, 58 S.Ct. 483, 82 L.Ed. 702, and this case were before this court at the same time, each involving the basic question of the extent of factual review of the Commission's order, as well as other assigned errors assailing the validity of the trial court's judgment. In each case our decision was rested upon the holding that the Commission's order was supported by that degree of probative evidence which rendered it immune from factual attack in the courts. Other assigned errors in each case we declined to consider on the expressed ground that this holding rendered them innocuous. To have applied the rule for which appellee contends—that it was entitled to an independent factual review and jury finding on all issues as to which the evidence raised any substantial dispute—would have required this court, as an imposed duty, to consider the other assigned errors, the result of which would have been a probable remand in the Laredo case and a certain remand in this case. Necessarily implicit in the Federal decision in the Laredo case is the approval of the ground upon which this court upheld the trial court's judgment. This is rendered more certain by the dissenting opinion of Mr. Justice McReynolds and Mr. Justice Butler, which is expressly predicated upon adherence to the Ben Avon rule and the assertion that the independent judicial review required by that rule

was shown to have been denied by this court. Manifestly, if the character of review for which appellee contends were required, then the Federal Supreme Court has denied to the utility in the Laredo case the right to have reviewed in this court important questions affecting the validity of the trial court's judgment expressly made reviewable in this court by the laws and decisions of this state. If appellee's version of the basis of the Federal Supreme Court's decision in this case were correct, that decision would be in irreconcilable conflict with the decision in the Laredo case, decided by the same court only three months prior to the decision in this case.

Another difficulty in adopting appellee's construction of the Federal Supreme Court's decision in this case lies in the fact that Mr. Justice Stone, who participated in the decision, pointedly expressed the contrary view to appellee's contention in concurring in the Stockyards decision. The Ben Avon decision was handed down in 1920. Mr. Justice McReynolds wrote the opinion of the court, and a vigorous dissenting opinion was filed by Mr. Justice Brandeis, which was concurred in by Mr. Justice Holmes and Mr. Justice Clarke on the point here at issue. Sixteen years later came the Stockyards decision. That case concerned an order of the Secretary of Agriculture, under the Packers and Stockyards Act of 1921, 7 U.S.C.A. § 181 et seq., reducing rates charged by St. Joseph Stockyards Company, which the Secretary held to be unreasonably high. The order was upheld by both the Federal trial and Supreme Courts. The question of independent judicial factual review was not necessarily involved but was discussed in the majority opinion by the Chief Justice. Mr. Justice Roberts merely "concurred in the result." A very able and exhaustive opinion was filed by Mr. Justice Brandeis, who while concurring also in the result, again vigorously dissented from the views upon the point at issue expressed by the Chief Justice. Mr. Justice Cardozo and Mr. Justice Stone concurred in the views of Mr. Justice Brandeis. We have no evidence of Mr. Justice Stone having changed his views upon this subject. If such were the case, it is hardly probable that he would have omitted to make note of the fact in the instant case, if, as contended by appellee, the decision is grounded upon the holding in the Ben Avon and the dictum in the Stockyards cases.

The latest expression of the Federal Supreme Court upon this question which has come to our knowledge is in the recent case of Rochester Telephone Corporation v. U. S., 59 S.Ct. 754, 761, 83 L.Ed. ——, opinion by Mr. Justice Frankfurter. After discussing the subject of factual judicial review of orders of the Interstate Commerce Commission, the opinion reads: "From these general considerations the Court evolved two specific doctrines limiting judicial review of orders of the Interstate Commerce Commission. One is the primary jurisdiction doctrine, firmly established in Texas & Pacific Ry. v. Abilene Cotton Oil Co., 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553, 9 Ann.Cas. 1075. Thereby matters which call for technical knowledge pertaining to transportation must first be passed upon by the Interstate Commerce Commission before a court can be invoked. The other is the doctrine of administrative finality. Even when resort to courts can be had to review a Commission's order, the range of issues open to review is narrow. Only questions affecting constitutional power, statutory authority and the basic prerequisites of proof can be raised. If these legal tests are satisfied, the Commission's order becomes incontestable. Interstate Commerce Commission v. Illinois Central R. R., 215 U.S. 452, 470, 30 S.Ct. 155, 160, 54 L.Ed. 280; Interstate Commerce Commission v. Union Pacific R. R., 222 U.S. 541, 32 S.Ct. 108, 56 L.Ed. 308."

The order there under review was that of the Communications Commission holding that the Rochester Corporation came under its *jurisdiction,* which presented the *factual* issue in the case. The opinion concludes: "The record amply justified the Communications Commission in making such findings. Investing the Commission with the duty of ascertaining 'control' of one company by another, Congress did not imply artificial tests of control. This is an issue of fact to be determined by the special circumstances of each case. So long as there is warrant in the record for the judgment of the expert body it must stand. The suggestion that the refusal to regard the New York ownership of only one third of the common stock of the Rochester as conclusive of the former's lack of control of the latter should invalidate the Commission's finding, disregards actualities in such intercorporate relations. *Having found that the record permitted the Commission to draw the conclusion that it did, a court travels beyond*

*its province to express concurrence therewith as an original question.* 'The judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body.' Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 286, 287, 54 S.Ct. 692, 693, 694, 78 L.Ed. 1260; Swayne & Hoyt, Ltd. v. United States, 300 U.S. 297, 303, et seq., 57 S.Ct. 478, 480, 81 L.Ed. 659." (Emphasis supplied.)

It is to be noted that Mr. Justice McReynolds and Mr. Justice Butler concurred only in the result.

The Supreme Court of Wisconsin had under consideration in 1937 the question whether independent judicial factual review was essential to due process under the Federal Constitution in appeals from state administrative boards as regards the facts essential to the jurisdiction of the administrative board. Such independent factual review had been held essential in appeals from orders of Federal agencies in Crowell v. Benson, 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598.

The Wisconsin case was an appeal from an award of the Industrial Commission of that state and presented the question whether an independent judicial review of the *jurisdictional* fact question—whether the injury arose in the course of the employment of the employee—was essential to satisfy due process. The opinion by Justice Wickhem is a clear, logical, and convincing presentation of the issue, and evidences a thorough familiarity with the subject and with the judicial literature and adjudications thereon. The conclusion was reached that the Crowell case is limited in its application to review of orders of Federal agencies and concerns the distribution of Federal governmental powers under the Federal Constitution; and that it has no relation to distribution of powers under state constitutions. Consequently where, under the constitution, laws, and decisions of a state, factual determinations, whether or not they are *jurisdictional,* are committed to an administrative agency under proper safeguards, independent factual judicial review is not essential to due process. The specific holdings on this subject are thus expressed: "It is our conclusion: (a) That the Compensation Act provides with respect to jurisdictional facts for a review of the same character and extent as that afforded by *certiorari*; (b) that this review satisfies the requirements of due process and avoids constitutional objections grounded upon the delegation of judicial power to a commission; (c) that these conclusions are not foreclosed by the doctrine of the *Crowell Case;* and (d) that this has been consistently held by this court since the enactment of the compensation act." General Accident F. & L. Corp. v. Indus. Com., 223 Wis. 635, 271 N.W. 385, 392.

In an able address upon the "Power of the courts to set aside Administrative Orders," delivered before a conference held in March, 1938, at Cincinnati under auspices of the Ohio Bar Association, Chief Justice Rosenberry, who participated in the Wisconsin decision, made the following interesting comment thereon:

"The court was called upon to review the whole matter recently (1937) and after giving full consideration to Crowell v. Benson, held that the compensation act provides with respect to jurisdictional facts for a review of the same character and extent as that afforded by certiorari; that such a review satisfies the requirements of due process and that this determination is consistent with the holding in Crowell v. Benson. By some it is thought the court unduly limited itself with respect to its right of review as to jurisdictional facts; that instead of holding as it did if there was any evidence, however slight, which sustained the finding, it should have held that it would inquire upon the whole evidence whether the minds of reasonable men could have come to the conclusion reached by the administrative agency.

"Although the precise question has not been discussed by the Supreme Court of the United States so far as I am able to discover, prior cases indicate that this determination will be upheld. In 1932, upon the authority of two prior cases, the decision in Helfrick v. Dahlstrom M. D. Co., 256 N.Y. 199, 176 N.E. 141, (1931), was affirmed by the Supreme Court of the United States. Dahlstrom Metallic Door Co. v. Industrial Board, 284 U.S. 594, 52 S.Ct. 202. That was just shortly before Crowell v. Benson. The Act under consideration in that case made the findings of the administrative agency conclusive. The Court of Appeals of New York upheld the statute on the authority of Interstate Commerce Commission v. Union Pacific R. R. Co. (1912), 222 U.S. 541, 32 S.Ct. 108, 56 L.Ed. 308, and other cases. It held that rate-making was a legislative matter while the determination of compensation was a judicial matter and for

·that reason the findings of the industrial ·board could be made conclusive. I had supposed the law was the other way—that a finding ·of fact. by the legislature was given the greater weight. I have always supposed the rule was the other way, that if you had a legislative determination of fact, that that was conclusive, but apparently the Court of Appeals thought differently. It is worthy of note that the Court of Appeals in commenting upon the distinction between rate cases and other cases involving administrative determinations of jurisdictional facts said:

"'So many are the complications in determining the question of fair return that necessity, not theory, has moved the. ·courts to this conclusion.'

"This is the best justification for the distinction between constitutional and jurisdictional facts and other facts upon which liability must rest that I have found in a court· decision. Whether necessity is a satisfactory basis for the distinction, I leave to you."

Likewise of·.interest, we think,· is Chief Justice Rosenberry's following comment upon the Ben Avon decision, especially in view of the holding of the Wisconsin case and the Chief Justice's above comment thereon:

, "It: is difficult to understand why such great dignity should be assigned to constitutional or jurisdictional facts in the field of. administrative law when they are not accorded. equal. dignity in other fields, as for instance, in the field of taxation or the taking of private property by condemnation. :

"* * * Value may be found by a taxing officer and in a proceeding before a. tax board of. review if the board of review confirms the assessment it becomes conclusive if sufficient evidence is adduced before the board to sustain the assessor's valuation. On the other hand the finding of a rate-making agency which proceeds in conformity with due process requirements is not accorded finality. It is submitted that the determination of fact, that is, value, is no more 'jurisdictional' in one case than in the other. If the assessor's valuation is in excess of the true value of the property assessed and the taxpayer is compelled to pay a tax upon the excess, his property is confiscated just as much as the property of a utility is confiscated if it is taken by way of an order. fixing rates based on a value lower than its reasonable value. The ultimate consequences may be very much more important, in one case than in the other but it seems to me that the legal principles which underlie the two are exactly. the same.

"The Act under consideration in Crowell v. Benson did not provide that all the evidence should be offered in the proceeding before the deputy commissioner. The sweeping language of the decision leaves no doubt that as to the so-called constitutional or jurisdictional facts the person against whom liability is asssessed is entitled to a trial de novo in a court in all cases."

The question of the proper extent of judicial review of administrative orders has had in recent years the widest possible consideration by courts, law writers, and law organizations; and the literature thereon is voluminous. While· there is a wide divergence of view as to the necessity and propriety of administrative agencies in many fields which they have invaded in recent years, it is quite generally recognized that such agencies are becoming more and more essential under our rapidly changing 'economic and social conditions. Such agencies in the field of utility and carrier rate-making are of long standing and· are practically universally employed. There is no substantial disagreement regarding their necessity.

In the June, 1939, issue of the American Bar Association Journal is published for the first time an essay by Prof. Malcolm McDermott, Professor of Law, Duke University Law School, upon the subject, "To What Extent Should Decisions of Administrative Bodies be Reviewable by the Courts?" The essay received "the award in 1939 contest conducted by the American Bar Association pursuant to the terms of bequest of the late Judge Erskine M. Ross." Thus concisely does Prof. McDermott summarize the criticisms that have been directed against these bodies: "* * *· The well-recognized disadvantages pertaining to administrative action are the tendency toward arbitrariness, lack of legal knowledge, susceptibility to political bias or pressure, often brought about by uncertainty of tenure, a disregard for the safeguards that insure a full and fair hearing, and a dangerous combination of legislative, executive and judicial functions."

For several years past the American Bar Association has. had. under careful.

study the subject of administrative agencies through its special committee created for that purpose. The last (1938) report of that committee was drafted by its Chairman, Roscoe Pound, Dean of the Harvard Law School. It constitutes a comprehensive treatise upon the subject, dealing largely with methods and expedients recommended as therapeutics for the "disadvantages" pointed out by Prof. McDermott. We quote the portion of the report setting forth asserted principles which should govern "with reference to state as well as federal administrative agencies" touching the subject of factual judicial review:

" (2) Judicial review of findings of fact should be preserved to the extent of ascertaining whether there has been a finding as distinguished from an arbitrary pronouncement, and whether that finding has a reasonable support in substantial evidence.

"(3) Judicial review should be jealously preserved to the extent of assuring due process of law by requiring a hearing of both sides, allowing each side to present its case fully and to meet fully everything to be used against it in arriving at a determination, precluding inspections with one party present and not the other, and interviews with representatives of one side in the absence of or without notice to the other.

" (4) Judicial review should be preserved to the extent of assuring action upon evidence rather than a preformed conception of the facts, and requiring determinations to proceed on the basis of full consideration of evidence and not on general ideas of expediency or getting things done.

" (5) Judicial review should be so limited as to insure (by requirement of record and findings) the three foregoing requirements, without substituting findings of fact or declarations of policy (within legal limits) by a court for findings or declarations committed by law to administrative agencies." American Bar Association Reports, Vol. 63, p. 361.

Appended to the report is a draft of a federal bill designed to effectuate the recommendations of the report. This draft was further considered in January, 1939, by the House of Delegates of the Association and adopted with some changes not pertinent here, and has been introduced in the Congress as S. 915, where it has received unanimous favorable report by the Senate Judiciary Committee. The provision relating to the extent of factual judicial review reads: " * * * Any decision or order of any agency or independent agency shall be set aside if it is made to appear (1) that the findings of fact are clearly erroneous, or (2) that the findings of fact are not supported by substantial evidence, or (3) that the decision or order is not supported by the findings of fact, or (4) that the decision or order was issued without due notice and a reasonable opportunity having been afforded the aggrieved party for a full and fair hearing, or (5) that the decision or order is beyond the jurisdiction of the agency or, independent agency, as the case may be, or (6) that the decision or order infringes the Constitution or statutes of the United States, or (7) that the decision or order is otherwise contrary to law."

A similar committee of the Association's Section of Judicial Administration has for the past two years considered the subject as it relates to state agencies. The report of that committee, which will be placed before the Section's meeting in July, is quite generally in agreement with that of the Association's special committee, and is accompanied by a proposed uniform state bill.

The "inconveniences" above pointed out, which constitute the main criticisms of administrative agencies, concern chiefly the subjects of personnel, the method of hearing and that of reaching and recording decisions. To minimize these "disadvantages", Dean Pound's report recommends methods and expedients designed to improve the personnel and procedure of such agencies. The problem of personnel is not peculiar to this branch of government, it is inherent in every branch. The judicial department is not altogether free from it. And this is true not only with reference to the judges but also the juries, —the triers of facts. The latter afford a perennial source of criticism. While the above Section report recognizes the possible eventuality of an ultimate holding by the Federal Supreme Court in line with the Ben Avon case, it is interesting to note that the report recommends that, where independent judicial factual review should be held essential to due process, such factual determination should be made by the judge and not the jury. In states where the common law distinction between law and equity is preserved this may be possible, at least where the reviewing pro-

ceeding is one in equity. But in this state, where the distinction between law and equity (other than to enforce the general principles of equity jurisprudence) has never been recognized, and the constitutional right of trial by jury is the same regardless of the proper classification of the case, it is difficult to conceive of that right being denied in a judicial proceeding held to require an independent factual review as an essential to due process. This, however, we hold not to be essential where, as here, the instrumentality created by the state is required to afford every essential to due process; as was held in the Wisconsin decision. Where, as here, a state, in the untrammeled exercise of its appropriate sovereign powers, has delegated to a quasi-legislative (or quasi-judicial) agency the authority of factual determination under proper legal safeguards and according to recognized legal standards that meet every essential requirement of due process, judicial review of the orders of such agency as to its factual determination is limited to the question whether the prescribed legal standard of probative evidence has been met. And this, whether such standard be: the scintilla of evidence rule, in vogue in some states, but never recognized in this state (Joske v. Irvine, 91 Tex. 574, 44 S.W. 1059); the substantial evidence rule, quite generally applied and recommended in the above committee reports; the rule that the findings of fact must be found not to be "clearly erroneous" (proposed Federal act); or the rule that the evidence taken as a whole is such that "the minds of reasonable men could have come to the conclusion reached by the administrative agency (Chief Justice Rosenberry's above address)." This judicial review presents a question of law only.

The above inconveniences, if at all applicable to the Texas Commission, are so in but very slight degree. Certainly they have no application to the order under consideration.

The Texas Railroad Commission was created in 1891, under express constitutional authority, if not in fact mandate. Art. X, Sec. 2. This provision was adopted by the people of Texas in 1890, because it was then thought that the powers essential to the proper functioning of such agency could not be otherwise delegated. The Commission was later (1894) expressly recognized in the constitution (Art. XVI, Sec. 30), its members made elective, and their tenure of office fixed at six years, with overlapping terms. In 1920 the legislature extended the rate-making function of the Commission to utilities, upheld in City of Denison v. Municipal Gas Co., 117 Tex. 291, 3 S.W.2d 794. The Commission has had wide experience in rate-making in the several fields delegated to it; besides having at its disposal technical advisers of recognized expert ability, especially in the intricate and difficult field of rate-making valuation. Its members are selected by the qualified electorate of the entire state, just as are the Governor and Justices of the Supreme Court. Their tenure of office is the same as that of the Supreme Court Justices. Every safeguard to a fair and impartial decision was afforded in this instance. The hearing lasted some seven months and every opportunity to present evidence and its views thereon was afforded the utility. The fact findings of the Commission were drawn with painstaking care, and, as we have held, are supported by abundant, if not in fact overwhelming, competent evidence. They have been most carefully and, as we believe, accurately analyzed in Justice BLAIR'S opinion. Every practical requirement of due process has been fully satisfied by the Commission—unless the states are impotent to create effective fact finding agencies in the utility rate-making field.

To set this order aside on the ground that appellee is entitled to an independent review of the facts would in effect be to transfer to the trial court the legislative function of rate-making, and require that court, through the intervention of a jury of men inexperienced in the technical and intricate subject involved, to substitute its judgment for that of the trained and experienced experts whom the law has provided for that purpose.

We are loath to believe that the Federal Supreme Court will set aside the order upon the invoked ground; and we are confirmed in the view that its mandate does not direct us to do so.

On the other hand, if ultimately our conclusion should not be upheld, it would be far better to have the issue definitely and authoritatively settled by the Federal Supreme Court in a review of our present judgment, than to subject this controversy, so important to a vast number of our citizenry as well as to the utility, to the delay, inconvenience, and expense necessarily incident to a remand for a new trial.

This court will lend every facility in its power to that end.

The purpose of this memorandum is not in any particular to alter or amend the views and holdings set forth in Justice BLAIR'S opinion, but only to record the full concurrence of each member of this court therein.

McCLENDON, C. J., and BLAIR and BAUGH, JJ., concur.